THE PEOPLE, Plaintiff and Respondent, v. DONALD
DUNCAN MEYER, Defendant and Appellant.

Vincent Hallinan and Carl B. Shapiro for Defendant and Appellant.

Stanley Mosk, Attorney General, Edward P. O'Brien and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

AGEE, J.—Defendant, a licensed physician, was indicted and convicted on 22 counts, each charging a narcotic offense. He was sentenced on counts 1, 4, 5, 8, 9, 12, 13, 16, 17, 18, 20 and 22, the sentences to run concurrently. The other 10 counts were dismissed by the court on its own motion, in compliance with the preclusion of double punishment for the same act. (Pen. Code, § 654.)

Defendant has appealed from the judgment and from the order denying his motion for a new trial. The latter is no longer appealable except in certain circumstances not present here (Pen. Code, § 1237, subd. 2; *People* v. *Britton*, 205 Cal. App.2d 561, 562 [22 Cal.Rptr. 921]), but we may review it on the appeal from the judgment (*People* v. *Lessard*, 58 Cal. 2d 447, 450 [25 Cal.Rptr. 78, 375 P.2d 46]).

The counts in the indictment relate to 10 prescriptions written by defendant, as to each of which he is charged in separate counts with a violation of section 11170, subdivision(2)[1]

---

[1] "No person shall make a false statement in any prescription. . . ."

and a violation of section 11170.5[2] of the Health and Safety Code. The additional two counts (17 and 20) each charges a violation of section 11500[3] of the Health and Safety Code. Number 17 relates to the same incident upon which counts 15 and 16 are based. Number 20 is similarly related to counts 18 and 19.

■ The evidence as to each prescription showed a uniform pattern, that defendant had written a narcotic prescription in the name of a person who usually was or had been a patient of his, that the prescription had been filled by some pharmacy, but that the person for whom the prescription was purportedly written never received either the prescription or the prescribed narcotics.

Evidence was also produced to show that the defendant had on occasions made illicit sales of fairly large quantities of narcotics to an acknowledged user.

The prosecution's theory was that the defendant used the prescriptions as a means of procuring narcotics which were subsequently used to supply persons other than those named on the prescriptions.

### Sufficiency of the Evidence

Defendant argues, as to the 20 prescription counts, that no crime was committed because each of the 10 prescriptions in question bore the true name of *some* person and that same person's true address. Thus, defendant continues, he did not violate either section 11170, subdivision (2) (making of any false statement in a prescription) or section 11170.5 (giving of a false name or address in connection with the prescribing of a narcotic), even though the prescriptions were not in fact written for the persons for whom they purported to be written.

Understandably enough, the point has never before been made to an appellate court of this state. Under similar circumstances, the use of an actual person's name on a prescription was held to be as much of a falsification as would have been the selection of a fictitious name. (*State* v. *Harkness*, 1 Wn.2d 530, 538 [96 P.2d 460, 464].) We do not believe that it is necessary to labor the point.

■ Defendant also argues the insufficiency of the evi-

[2] 'No person shall, in connection with the prescribing . . . of a narcotic, give a false name or false address.'

[3] This section proscribes the unlawful possession of narcotics other than marijuana.

dence as to the possession counts, numbered 17 and 20. Count 17 relates to the unlawful possession of 48 Dilaudid tablets which were delivered to defendant's office by the Apothecary Pharmacy on May 19, 1961. Defendant telephoned the prescription in to the pharmacy. He told the pharmacy, which was concerned about delivery because the patient lived in Pacifica, to send it to his office C.O.D. and that he would get it to her since he intended to make a house call the following day. Defendant admitted writing the prescription and that someone from the pharmacy picked it up at his office. The prescription is in evidence. The person for whom the prescription was purportedly written, Mrs. Mary Castro, testified that she had never received the prescription or the prescribed narcotics. In fact, she was not treated by defendant after May 14, 1961. On May 19, 1961, she was taken to the San Mateo County Hospital by ambulance, where she remained until September 16, 1961.

Defendant's contention is that there is no direct evidence that he *personally received* the drugs in question. His counsel's cross-examination of the pharmacist brought out the point as follows: "Q. Do you know who received it in his office, was there any receipt? A. That I cannot tell you. I know it was delivered to the office and it was paid for in the office."

■ However, it is well established that mere *constructive* possession of a narcotic constitutes a violation of the possession statute. (*People* v. *White,* 50 Cal.2d 428 [325 P.2d 985]; *People* v. *Cahill,* 163 Cal.App.2d 15 [328 P.2d 995].)

■ It is likewise true that such constructive possession can be proved by *circumstantial* evidence. (*People* v. *Cahill, supra,* pp. 20-21; *People* v. *Blinks,* 158 Cal.App.2d 264, 267 [322 P.2d 466].)

■ Here, the narcotic left the pharmacy under an arrangement made by the defendant that it was to be delivered to him at his office and that he, in turn, would deliver it in person on the following day to the patient at her home in Pacifica. Defendant had dominion and control over the narcotic when it arrived at his office and it is not necessary that he personally receive it or know of its arrival. (*People* v. *White, supra,* p. 431.)

■ The defendant also questions the sufficiency of the evidence as to the felonious nature of the possession. In so doing he presumably relies upon the privilege to possess nar-

cotics which is afforded to physicians. ▆ It is true that certain privileges with respect to the possession of narcotics are afforded to physicians and others engaged in the care and treatment of the sick. However, these privileges are not absolute, and the statutes and cases carefully circumscribe the possession and use of narcotics by such persons to the purpose of the privilege (*People* v. *Marschalk,* 206 Cal.App.2d 346, 350 [23 Cal.Rptr. 743]). When the possession of the narcotic is for a purpose not connected with the privilege, the possession is unlawful (*People* v. *Marschalk, supra,* p. 350; *People* v. *Silver,* 176 Cal.App.2d 377, 379-380 [1 Cal.Rptr. 179]).

▆ Under the facts and circumstances as presented at the trial, virtually the only inference the jury could draw as to the nature of the possession was that it was unlawful and that the defendant had written the prescription as a means of acquiring the narcotics for his own illicit purposes. The jury was presented with instance after instance in which the defendant had written prescriptions which were later filled by various pharmacies and yet the person for whom the prescription was supposedly written received neither the prescription nor the narcotics. The jury had also received evidence of illicit sales of narcotics by the defendant to an ackowledged user. Under such facts, the jury quite properly concluded that the defendant's possession of the narcotics was an unlawful one.

▆ Count 20 relates to the unlawful possession of 40 Dilaudid tablets covered by a prescription dated August 3, 1961, written by defendant. On said date he presented the prescription at the Day Drug Company and personally received the narcotics which it called for.

The prescription was purportedly written for a Maude Heady. On July 27, 1961, she had been removed from her hotel room on Powell Street, San Francisco, to San Francisco General Hospital. She remained there until transferred to Napa State Hospital on September 11, 1961. During the period when she was at the General Hospital, defendant was not allowed to treat her because the hospital rules provided that only physicians on its staff were authorized to treat patients confined there.

The defendant admitted knowing that this was the rule. Nevertheless, he testified that he delivered the narcotics to Mrs. Heady at the hospital. Mrs. Heady died on January 22, 1962. The jury was thus left with the admitted possession of the

narcotics by the defendant, his uncorroborated explanation of what he did with them, and the reasonable inferences that could be drawn from all of the surrounding circumstances, including his course of conduct in numerous other similar instances.

We cannot say that the jury was unreasonable in drawing the inference that this was but another instance in which the defendant had used a prescription supposedly written for a patient as a means of acquiring narcotics for his own purposes. Such a possession does not come within the purpose of the privilege afforded to him as a physician and consequently it was an unlawful possession. (*People* v. *Marschalk, supra,* p. 350.)

### Instructions

(a) *Credibility of narcotics user as a witness.* One Harry Chapman was called by the prosecution as its witness. He admitted being a user of narcotics, giving as an excuse that he had injured a leg in an accident. He admitted taking a narcotic on the morning of the day he testified.

The court refused to give the following instruction proposed by defendant: "You are instructed that the inordinate use of a narcotic drug tends to create an irresistible [*sic*] craving and forms a habit for its continued use until one becomes an addict, and he respects no convention or obligation and will *lie*, steal, or use any other base means to *gratify his passion for the drugs,* being lost to all considerations of duty and social position." (Italics ours.)

The factual situation contemplated by this requested instruction refers to the veracity of an addict when seeking "to gratify his passion for the drugs." There is no evidence in this case to support the hypothesis that the witness was seeking, by his testimony, to obtain drugs for his own use. He testified that he had illegally obtained Percodan tablets from the defendant on many occasions. The effect of such testimony would be to cut off this source of supply rather than to continue or create one.

The form of the instruction, as proposed by defendant, does not require any discussion of the broad proposition, which defendant now urges in his brief,[4] that the trial court should instruct the jury on "the effects of narcotics on the integrity and moral caliber of the addict." It may be noted, however,

---

[4] Counsel appearing on this appeal are not the same counsel for appellant in the trial court.

that there is a considerable disagreement on the subject. (See Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach,* 48 Cal.L.Rev. 648, 676-679.) No decision has come to our attention which discusses the propriety of an instruction to the effect that a narcotics addict is more likely to lie than a witness who is not so addicted. ■ As stated by Juviler, *supra,* at pages 677-678: "But according to the more modern theory, drugs do *not* convert addicts into liars. . . . This view is subject to the caution that if the addict is deprived of the narcotic, he may perjure himself to obtain the drug; but it also entails the paradox that the addict may be most credible when *using* the drug." (Italics by the author.)

(b) *Refusal of "included offense" instruction.* This instruction proposed to tell the jury that the offenses (felonies) charged in the indictment under sections 11170, subdivision (2), and 11170.5 of the Health and Safety Code necessarily included the offenses (misdemeanors) denounced by sections 11168 and/or 11225 of the same code. The defendant's objective is stated in the first paragraph of his proposed instruction, as follows: "You may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, if, in your judgment, the evidence supports such a verdict under my instructions." (Based on Pen. Code, § 1159.)

■ The test as to what offenses are necessarily included offenses within the meaning of section 1159 of the Penal Code is whether the lesser offense is necessarily included under the language of the accusatory pleading. (*People* v. *Marshall,* 48 Cal.2d 394, 405 [309 P.2d 456]; *People* v. *Lawrence,* 198 Cal.App.2d 54, 64 [18 Cal.Rptr. 196].) In the instant case, each of the 20 counts charging a violation of either section 11170, subdivision (2), or section 11170.5 of the Health and Safety Code is couched essentially in the language of the code section alleged to have been violated. The question then is whether, under the language of these charges, the defendant *necessarily* must violate section 11168[5] or section 11225[6] or both, in order to commit the offense charged. (*People* v. *Marshall, supra.*)

---

[5]Section 11168 provides: "No person shall prescribe, administer, or furnish a narcotic except under the conditions and in the manner provided by this division."

[6]Section 11225 provides: "Every person who issues a prescription, or administers or dispenses a narcotic shall make a record that, as to

This question, so far as it relates to section 11168, was specifically answered in the negative in *People* v. *Lawrence, supra.* Only section 11170.5 (false name and address) was referred to in this connection, but the court's reasoning is equally applicable to section 11170, subdivision (2) (false statement in prescription). Both of these sections refer to the *form* of a prescription or record, whereas section 11168 refers to the *substantive* matter of prescribing a narcotic for a person who is not legally entitled to it. In other words, while the placing of a false name or address on a prescription by a physician involves a violation of both section 11170, subdivision (2), and section 11170.5, it does not *necessarily* involve a violation of section 11168.

 In *Lawrence,* the court said, at page 65: ''As to count 2—section 11170.5 provides a specific offense—giving a false name or address in connection with prescribing a narcotic. Section 11168 is a general statute prohibiting the prescribing, administering or furnishing of narcotics not under the conditions provided by division 10. The Legislature must have had some object in mind when it provided a general offense and the specific offense. A reasonable interpretation of section 11168 would not include the giving of a false name or address. Prescribing or furnishing a narcotic not under the conditions provided by the division refers not to the form of a prescription or record, but to the substantive matter of prescribing a narcotic to an individual not entitled to receive it because his situation does not meet the conditions prescribed in division 10. The offense of violating section 11170.5 is charged in the language of the code. It can be committed without necessarily violating section 11168. For this reason section 11168 is not an offense included in section 11170.5.''

The court further pointed out that, even if section 11168 would apply to the giving of a false name or address, such an act would not constitute a lesser included offense within section 11170.5, but would constitute an *identical* offense with the latter, and the defendant would not be entitled to be found guilty of the same offense under section 11168, which provides a lesser punishment than is the punishment under sec-

the transaction, shows all of the following: (a) The name and address of the patient. (b) The date. (c) The character and quantity of the narcotics involved. (d) The pathology and purpose for which the prescription is issued, or the narcotic administered, prescribed, or dispensed.''

tion 11170.5. As to this point, the court cited and relied upon *Berra* v. *United States* (1955) 351 U.S. 131 [76 S.Ct. 685, 100 L.Ed. 1013].

Nor was section 11225 a lesser included offense within sections 11170, subdivision (2), or 11170.5. Section 11225 relates solely to the *record* which a person must make and preserve (§ 11226) concerning narcotics which he has prescribed, administered or dispensed. On the other hand, section 11170.5 relates to the giving of a false name or address in connection with prescribing a narcotic, and section 11170, subdivision (2), prohibits the making of a false statement in any prescription, order, report or record required by division 10 of the Health and Safety Code.

It seems clear that one could violate section 11170.5 or section 11170, subdivision (2), without necessarily violating section 11225. For example, a "patient" may properly be convicted under section 11170.5 for giving a false name and address to the prescribing physician. (*People* v. *Oviedo,* 106 Cal.App.2d 690 [235 P.2d 612].) Yet such a "patient" would not thereby be violating section 11225 because that section only imposes a duty upon one "who issues a prescription, or administers or dispenses a narcotic." And a physician could violate sections 11170, subdivision (2), and 11170.5 by writing a false prescription of the type involved herein and still comply with section 11225 by making a truthful entry of the transaction in his office narcotic records.

Another manner in which section 11170, subdivision (2), may be violated without necessarily violating section 11225 is by the making of a false statement in any written order required to be executed under the provisions of section 11570. This latter section authorizes retail sales of narcotics by pharmacists to physicians, dentists, chiropodists, and veterinarians without the requirement of a prescription. Such a purchase order would in no way be subject to the provisions of section 11225, which applies only to the record to be made as to the prescribing, administering or dispensing of a narcotic to a *patient*. Yet a false statement in the purchase order required by section 11570 would violate section 11170, subdivision (2), in that it would constitute the making of "a false statement in any prescription, order, report, or record, required by this division [§§ 11000-11853]."

To summarize, a defendant who is charged in the wording of section 11170, subdivision (2), or section 11170.5 does not *always* have to violate section 11225 in order to commit

the offenses charged. This is the test. (*People* v. *Marshall, supra,* p. 398.)

Moreover, even if a defendant was charged under section 11170, subdivision (2), for making a false statement in a record and it could be said that the same act could constitute a violation of section 11225, such an act would not constitute a lesser included offense but rather would constitute an *identical offense.* (See discussion, *ante.*)

The trial court properly refused the defendant's "included offense" instruction, since neither section 11168 nor section 11225 was a lesser and "necessarily included" offense within section 11170, subdivision (2), or section 11170.5, either under the language of the charges as pleaded or under the facts and circumstances as shown by the evidence.

(c) Defendant offered two instructions which set forth his argument as to what might have happened to narcotics and records kept in his office. These requested instructions are similarly worded, one referring to narcotics and the other to records.

They advised the jury that the defendant kept his patients' records and narcotics in an unlocked office filing cabinet which was readily accessible to his employees and other persons who might be in his office suite from time to time; that the fact that certain narcotics and records were missing or unaccounted for would no more serve to prove that defendant had dispensed or disposed of the same than it would tend to establish that they were disposed of by some employee or other person having access thereto.

These proposed instructions are argumentative and evidentiary in form. The jury was fully and correctly instructed on circumstantial evidence and inferences which could be drawn therefrom. We find no error in the refusal of the trial court to give the instructions requested.

(d) Defendant complains of the giving of an instruction to the effect that each count in the indictment charged a separate and distinct offense and that he might be convicted or acquitted upon any or all of the offenses charged.

Defendant's contention is stated as follows: "To instruct the jury that they could acquit the defendant on count 1 and convict him on count 2, for example, is a distinct misstatement of the law, because the two counts are in fact different ways of stating the same offense."

This contention is answered by section 954 of the Penal

Code, which permits the charging in separate counts of the same offense and further provides that the prosecution may not be compelled to elect between the different counts and that an acquittal on one or more counts shall not be deemed an acquittal on any other count. Thus, an instruction that defendant could be convicted or acquitted on any or all of the offenses charged was proper.

Conversely, it would be improper to instruct the jury that, if they convict defendant of count 1, they were *required* to acquit him on count 2. Here, as to each prescription, the same identical facts amounted to violations of *both* of the charged code sections.

Contrasted to this is a situation where it would be inconsistent factually for a jury to find that a defendant's conduct violated multiple charged counts. Where the offenses charged are mutually exclusive, a jury should be instructed to acquit on one alternative if they should convict on the other. (*People* v. *Persky,* 167 Cal.App.2d 134, 140-141 [334 P.2d 219].) Where the charges are not mutually exclusive and the defendant may be found guilty on more than one charge *without any factual inconsistency,* the protection afforded to him is not one against multiple conviction (Pen. Code, § 954) but rather against multiple punishment (Pen. Code, § 654; *People* v. *Brown,* 49 Cal.2d 577, 591 [320 P.2d 5]; *People* v. *Hawkins,* 196 Cal.App.2d 832, 838-840 [17 Cal.Rptr. 66]).

(e) The last instruction complained of refers to the effect of possession of narcotics by an employee of defendant for the purpose of delivery to a patient. It applies only to one of the two possession counts, count 17, since defendant testified that he had personally delivered the narcotics involved in count 20 to the patient, Mrs. Heady, at San Francisco General Hospital.

The evidence relating to count 17 has already been discussed under "Sufficiency of the Evidence." The pharmacist who filled the prescription testified that defendant had stated that the narcotics were to be delivered to his office and that he would take them to the patient himself on the following day.

The defendant inferred in his testimony that a Toni Whitson, who had been an employee of his, actually delivered the narcotics to the patient. In response to a question by his counsel as to this, defendant testified as follows: "I don't know that but I suspect so." He further testified that he had

talked to Mrs. Whitson about getting the prescription out to Mrs. Castro, the patient, and that, when the messenger from the pharmacy called at his office to obtain the prescription signed by defendant, either he or Mrs. Whitson handed it to him. Mrs. Whitson figured rather prominently in the case. The defendant wrote prescriptions for her under various names but he testified that ''the name we carried her on the payroll was Fantasia, after the annulment.''

Thus, a factual situation was set up which might have caused the jury to believe that the defendant had entrusted the narcotics to Mrs. Whitson for delivery to the patient. This being so, the court felt impelled to instruct on the legal effect thereof.

The instruction given was extremely favorable to the defendant. It is as follows: ''You are instructed that the defendant had the legal right to prescribe narcotics for patients and in so doing to facilitate their delivery to the patient, and that in order to find him guilty of the crime of possession, you must first find not only that he did not make out a prescription in good faith for a patient for the treatment of a pathological condition, but that he did not make any effort in good faith to deliver either the prescription or the narcotic issued thereunder to the patient; and in this connection you are instructed that the employment of his office personnel to make said delivery is neither illegal nor in any way improper unless you can also find that the doctor had actual knowledge that the delivery to patients would not be made by said personnel, and that he made no effort to correct the situation.''

Defendant states his criticism of this instruction as follows: ''[I]t was clearly error to instruct the jury that the doctor would be liable for the treachery of his employees or of other persons who were working adversely to him and not in concert with him.''

This criticism is unwarranted. The instruction told the jury very plainly that the defendant *could* use his office personnel (Toni Whitson) to make the delivery *unless* he had *actual knowledge* that she would not make the delivery and he made no effort to correct the situation.

### *Alleged ''Evidentiary Errors''*

(a) Defendant complains of the court's ruling that he could not impeach a prosecution witness, Mrs. Clausen, by showing that she had made a claim against an insurance company for damages arising out of an automobile accident,

which claim included a false representation that she had paid the defendant a certain amount of money for medical services rendered to her by him. The ruling was correct. A witness may not be impeached by evidence of particular wrongful acts with the single exception of showing a felony conviction. (Code Civ. Proc., § 2051; *Steen* v. *Santa Clara Valley M. & L. Co.*, 134 Cal. 355 [66 P. 321] ; *People* v. *Courtney*, 176 Cal.App.2d 731, 742 [1 Cal.Rptr. 789].)

(b) With no reference to the transcript as required by rule 15(a) of the California Rules of Court (formerly rule 15(a) of the Rules on Appeal) and with no citation of authority, the defendant contends that the prosecution prejudiced his defense by withholding information as to the names and addresses of prosecution witnesses and in not making available to him his business records. While the prosecution has made a long and indignant reply, we need not further consider a contention made in this manner. (Cf. *People* v. *De Shore*, 192 Cal.App.2d 679, 680-681 [13 Cal.Rptr. 472] ; *People* v. *MacArthur*, 125 Cal.App.2d 212, 217 [270 P.2d 37] ; 4 Cal.Jur.2d, Appeal and Error, §§ 482, 484.)

(c) Defendant's counsel rather dramatically interrupted the direct examination of the prosecution witness Harry Chapman by stating: "Your Honor, I would like to make a motion. Your Honor, I move the Court at this time that this witness be examined by a psychiatrist. I don't feel that this man is a qualified and competent witness." The motion was denied.

The determination of the competency of a witness is almost wholly within the discretion of the trial court. (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 421 [317 P.2d 974]; *People* v. *Wilder* (1957) 151 Cal.App.2d 698, 706 [312 P.2d 425].) No abuse of that discretion has been shown. The transcript of his testimony indicates that he was very competent.

(d) Defendant complains that the record on appeal does not include three tape recordings of telephone conversations in which defendant participated. These tapes were admitted in evidence and played to the jury. We have now augmented the record by adding them. Defendant does not make any other point with respect to the tapes or the conversations recorded thereon and therefore we have not caused them to be transcribed.

## Denial of New Trial

Defendant states that "he based this request [for a

new trial] on an affidavit of a primary prosecution witness, Amelia McKay, who heard Esther Clausen, another prosecution witness, admit that she had lied on the witness stand and this admission was made in the presence of the District Attorney." Defendant styles this as "newly discovered evidence." No counteraffidavits were filed by the prosecution.

The granting or denial of a motion for a new trial on the ground of newly discovered evidence rests in the sound discretion of the trial court. (*People* v. *Beard,* 46 Cal.2d 278, 281 [294 P.2d 29].)

Mrs. McKay's affidavit is to the effect that Mrs. Clausen had just completed her testimony and was standing in the corridor outside the courtroom with the prosecuting attorney and a narcotics agent; that the prosecutor asked her "why did you lie on the witness stand?" and Mrs. Clausen replied that "I don't know, I didn't know what to say."

There is nothing in the affidavit or elsewhere which indicates what portion of Mrs. Clausen's testimony allegedly was being discussed except the following statement in the affidavit: "Mr. Shaw [prosecutor] and Mrs. Clausen were discussing what she had *just* said on the witness stand . . ." (italics ours).

Mrs. Clausen was on the stand for two full days, interrupted only by three short witnesses. She concluded her testimony on the morning of the third day and the conversation in question is alleged to have occurred immediately thereafter.

The trial judge had had the opportunity of observing Mrs. Clausen on the witness stand and hearing her testimony. He was not required to accept as true the affidavit of Mrs. McKay even in the absence of any affidavit to the contrary. (*Lohman* v. *Lohman,* 29 Cal.2d 144, 149 [173 P.2d 657] ; *People* v. *Canada,* 183 Cal.App.2d 637, 642 [7 Cal.Rptr. 39].) We cannot say that the denial of a new trial was an abuse of discretion.

### Denial of Probation

Probation is not a matter of right but rather is an act of clemency. (*People* v. *Miller,* 186 Cal.App.2d 34, 36 [8 Cal.Rptr. 578].) An order denying probation will not be reviewed on appeal unless the record clearly shows an abuse of discretion. (*People* v. *Roberson,* 167 Cal.App.2d 542, 545-546 [334 P.2d 578].) We find no such abuse in the instant case.

### *"The Errors Were Prejudicial"*

Under this heading, defendant argues that the errors complained of became highly prejudicial because the question as to his guilt was so close.

(a) "The Poisoned Well." This point consists of an attack upon the characters of the prosecution witnesses and concludes that "a jury could readily disbelieve the stable of witnesses dredged up by the District Attorney when their character and reputations were weighed against the character and the reputations of the defense witnesses." The credibility of the witnesses was for the jury to decide. (Code Civ. Proc., § 1847.)

(b) "The Shotgun Approach." Defendant contends that the jury must have been unduly influenced against the defendant by the number of counts (22) charged in the indictment, whereas only 10 prescriptions were directly related to these charges. As we have seen, such pleading is permissible under the law (Pen. Code, § 954) and we find no impropriety in charging the defendant accordingly.

Although defendant has not raised the point, we note that there is a variance between the verdicts returned on counts 3 and 4. In each form of verdict prepared for the jury's convenience, there were included the name of the "patient" and the date of the prescription as they appeared thereon. For example, in the verdicts prepared as to counts 1 and 2, the following appears on each: "Isabel Spiriti—10/13/61 20 cc vial dolophine."

As to counts 3 and 4, however, there is a variance as to dates. The form of the verdict as to count 3 has the following: "Esther Clausen—8/*9*/61 28 dilaudid." Whereas, the form as to count 4 has the date as "8/*19*/61." (Italics ours.) However, there was no confusion at the trial as to the correct date of the incident involved, which is August 19, 1961. The prescription was so dated and was admitted in evidence. The date, August 9, 1961, was never mentioned in connection with any other prescription which listed Mrs. Clausen thereon as the "patient." All of the testimony regarding this prescription fixed the date as August 19, 1961.

Defendant points out that counts 3 and 4 of the indictment allege the date of the occurence of the offense to be September 22, 1961, instead of August 19, 1961. However, no question of variance was raised during trial nor was there ever any confusion during the trial because of such variance.

In his opening statement to the jury, the prosecutor stated: "And in Counts 3 and 4, the same situation prevails. We are talking about one prescription but charging two different violations . . . Counts 3 and 4 involve the issuance of a prescription by the Doctor on *August 19th* in the name of Esther Clausen, who, the testimony will show, was previously employed as a medical secretary for the defendant." (Italics ours.)

Within minutes thereafter, Mrs. Clausen took the witness stand and testified concerning this prescription. The defendant has not shown that he was misled or that any prejudice resulted to him from the variance between the date charged and the date when the evidence shows the offense actually occurred. He admitted writing the prescription, his defense being that he did so as a physician prescribing for Mrs. Clausen as a patient.

The rule applicable here is as stated in section 955 of the Penal Code, as follows: "The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, *except where the time is a material ingredient in the offense.*" (Italics ours.) We find that no prejudice was suffered by defendant as the result of the variance.

(c) Conviction by Hearsay. Defendant complains that three of the seven "patients" named in the prescriptions involved in the 22 counts were not called as witnesses. Mrs. Heady, one of these, died before the trial. Another, Linda Walker, was living in the Hawaiian Islands at the time of trial. The third, Annie Ward, was committed to Napa State Hospital prior to the trial, on the basis of a diagnosis of chronic undifferentiated schizophrenia.

However, the convictions as to the counts in which these three persons were named on the prescriptions in question (5, 6, 18, 19, 20, 21, and 22) were based on either direct or circumstantial evidence offered by other witnesses who testified quite properly as to those phases of the case concerning which they had personal knowledge. (Code Civ. Proc., § 1845.) ■ A verdict based upon circumstantial evidence in part is no basis for complaint.

The judgment is affirmed and the appeal from the order denying a new trial is dismissed.

Kaufman, P. J., and Shoemaker, J., concurred.