[Crim. No. 4656. First Dist., Div. One. Nov. 30, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. GRANT
WILSON, JR., Defendant and Appellant.

448

John J. Fahey, Herman W. Mintz, James Giller, David A. Himmelman and Edward J. Cragen for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Following a jury verdict finding defendant guilty of burglary in the first degree in violation of section 459 of the Penal Code, he was sentenced to be imprisoned in the state prison for the term prescribed by law. Execution of sentence was suspended and he was placed on probation for a period of four years upon terms and conditions which included serving a term of one year in the county jail. Defendant has appealed from the final judgment of conviction, from the sentence imposed, and from an order denying a motion for a new trial. Although the propriety of the order denying a motion for a new trial may be reviewed on the appeal from the judgment, no appeal lies from it as such, so the purported appeal from that order must be dismissed. (Pen. Code, § 1237.) The appeal from the sentence is merged in that from the judgment. (*Id.,* and see *People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].)

Defendant contends that the trial court erred in admitting testimony of ''conversations'' had with the defendant. Because there is only one statement of the defendant involved, the question is more properly framed as whether or not the trial court was justified in admitting evidence of questions propounded to the defendant, together with evidence of the lone answer to one and his failure to answer the remaining questions, on the grounds that such evidence either showed acquiescence of the defendant in the truth of the statement, or indicated his consciousness of guilt. For reasons hereinafter set forth the rulings of the trial court are upheld.

The defendant contends that it was error to admit in evidence certain articles found on his person which were not shown to have been actually connected with the burglary which in fact occurred; that it was error for the prosecutor

to maintain these articles in view of the jury prior to their introduction in evidence; and that the prosecutor committed prejudicial error in referring in his argument to an article which was not admitted in evidence. A review herein of the circumstances of this case reflects that all of the articles were properly before the jury and no error can be predicated on any of the foregoing propositions.

Defendant does not contend that the evidence is insufficient to sustain his conviction. It is, however, necessary to recount it in substance so that the matters complained of can be viewed in proper perspective. This is particularly true insofar as it is contended that certain police action violated defendant's prearraignment right to be advised of his rights to counsel and to remain silent. (See *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97].)

The victim, a United States Treasury Agent, testified that he lived in apartment 002 of a three-story apartment building with approximately 20 units at 271 Vernon Street in Oakland; that his apartment was the rear one of two on a floor below the level of Vernon Street, but above the carport area in the back of the apartment.

On Friday, September 13, 1963, at about 7 p.m., he left the apartment for the weekend, turned off the lights, and locked the door. Keys to the apartment were held by himself, the manager and his wife, who was away during all of the period involved. Although the bed was not made up, generally everything was in order in the apartment.

Early the following morning, at 3:30 a.m. on September 14th, pursuant to directions received on the police radio, three officers converged on the premises at 271 Vernon Street. Officer Lusk, the first to arrive, talked to a man coming out of the driveway of the premises and went down the driveway into a garage area under the apartment building. He continued on through a door to the back of the building to another parking area under the apartment and checked the automobiles there. Officer Hoover, who pulled up as Lusk was getting out of his car, walked over and talked to the reporting party in the driveway with Lusk. While he was still there Officer Fiege arrived and joined the conversation. Hoover went down to check cars in the subterranean garage.

Fiege went searching down through the garage and out the same door through which Lusk had exited toward the rear of

the building. He descended some stairs which led to a back driveway leading to the carports under the apartment. Just before he entered the driveway he heard a commotion of feet moving in the driveway and around the side of the building. He stepped around the corner, showed his flashlight in the direction from which he had heard the noise, and saw the lower half of a man going in the doorway in the middle of the building. He shouted, ''Come out of there,'' went to the doorway and observed two men going through a doorway at the top of some stairs at the end of a hall. He got to the top of the stairs in time to see the two men running down another hallway. He observed that they both had on dark clothes and that the rearmost of the two men had black gloves on and some kind of black cloth in his left rear pocket. The man in front seemed to have a suit coat on, and the other a knit-type sweater. Fiege was running and shouting ''Halt,'' but the men did not halt. They ran out of the building, turned right on Vernon Street, and turned off Vernon Street into a driveway.

Meanwhile Lusk, who was also in the rear of the building, had heard Fiege's shouts. He turned and saw Fiege starting up the stairway. He ran over and saw Fiege at the first landing with someone running ahead of him. Lusk doubled back around the side of the building, and by the time he came to the street there was no one there.

Hoover, who was just about to go through the door from the subterranean garage to the rear, heard the shouts and sounds of running to the rear of the building. He ran toward the street and as he came up the stairway saw ''people'' running south on Vernon with Officer Fiege running after them. He chased them down Vernon Street and saw one turn in the driveway.

Fiege, who was tired, gave up the chase at the point where Hoover overtook him, and returned to his patrol car. Hoover ran into the driveway and stopped momentarily in a parking area. He heard sounds to the south and to the west, and followed those which he believed to be the closer. Upon arriving at a stairway he saw a person descending and yelled, ''Stop, police.'' The suspect turned north on reaching the street at the foot of the stairs, and Hoover, on arriving at the same street, observed him run northbound and turn to the left between two buildings. At this point Fiege drove by, conversed with Hoover and continued around the block. Hoover again saw the suspect as the latter emerged from

between the two buildings and started to run across a traffic island. When the officer again yelled, "Stop, or I will shoot," he stopped. Hoover held him, now identified as the defendant, at gun point. He was joined by Officer Dorsey who handcuffed the defendant and in less than a minute Fiege came on the scene.

Both Fiege and Hoover noticed that the defendant was out of breath and sweating profusely, and according to Hoover, he appeared to be frightened. He was attired in a white shirt with a dark sweater which was tucked in at the collar, dark pants, dark shoes and no socks. He had black leather gloves on, and held a silver pen-light in his hand.

At the trial Hoover was asked to relate any conversation he had with the defendant at this point. After objection was overruled the following transpired: "Q. . . . What did you say? A. I asked him what his name was. Q. What did he say? A. He didn't say anything. Q. Any other questions by you? A. I asked him where he was going in such a hurry. Q. What did he say, if anything? A. He didn't say anything."

Hoover then searched the defendant and found the following: three pairs of socks—gray, black and brown argyle—and a black silk sack in his left rear pants pocket; a second small pen-light in the sack; a black Navy watch cap in the right front pants pocket; a pair of bolt cutters with the handles cut off in his right rear pants pocket; and three plastic strips in his only shirt pocket. Defendant bore no wallet, credit cards or other cards indicating his identification. He had nothing else on his person other than a normal man's white handkerchief and money amounting to seven or eight dollars.

Fiege placed the defendant in his patrol car and returned to park in front of 271 Vernon Street. Hoover retraced his steps in a vain search for anything that might possibly have been thrown away. Meanwhile Lusk had been looking around the apartment building and found the door of apartment 002 open 2 or 3 inches. The apartment was dark and no one responded when he rang the bell. He went out to the front to get another officer to enter the apartment with him.

Lusk met Hoover, who had returned to the apartment building, and they returned and entered apartment 002. They observed three jewelry boxes and the scattered contents thereof on the bed, and drawers of a dresser standing open.

At the trial Fiege was interrogated as to what transpired in the police car and, after defendant's objection was overruled, testified as follows: ''Q. All right, what did you say to the defendant; what was the conversation, Officer? A. I asked the defendant his name. He did not answer. I asked him his address. He did not answer. I asked him if he lived in that area. He did not answer. I asked him who he had been with. He did not answer. I asked him if there was anybody in the area that I could contact to clear him, and he still did not answer.''

The witness continued: ''This took a few minutes. I was interrogating him and Officer Hoover came to the side of the car and said, 'There was a burglary committed in that building.' ''

These remarks were stricken pending presentation of further foundation and argument which ended in the overruling of defendant's objection, and the examination continued as follows: ''Q. What did Officer Hoover say? A. Officer Hoover told me that there had been a burglary committed in 271 Vernon Street. Q. Did you have further conversation with the defendant at that time? A. I did. Q. What did you say and what did he say? A. I told the defendant that there was a burglary in that building and he was under arrest for investigation of burglary, and I asked him if he had anything to say for himself. I repeated this twice. On the third time he said, his answer was, 'Was there a burglary committed in that building?' ''

According to the officer the only other remark which was passed to or from the defendant was, in the witness' words: ''The only thing I did say was that we would have to book him without a name because he wouldn't give us his name or address or anything else.''

Lusk returned to the apartment with the manager, locked it up and left a note for the tenant. The victim returned to the apartment about 1 p.m. on Sunday, September 15th. He found the jewelry boxes lying dumped over with their contents spread out over the bed, and discovered that a gun and handcuffs had been taken from the top drawer of a chest of drawers. Subsequently, after examining the articles held by the police, he discovered that the pair of black stretch socks and the pair of brown argyle socks with a small hole were missing from the third drawer of the same chest. Nothing else was missing from the apartment.

An experienced burglary investigator testified that he was familiar with tools used by burglars in practicing their trade or profession; that the bolt cutters, the handles of which had been shortened, and the isinglass or plastic strips are burglary tools; that he had opened both a door to the apartment building and the door to apartment 002 by use of one of the strips; that a plastic strip when so used usually does not leave a mark; and that the bolt cutters if used to cut a night chain, or as a prying instrument, would leave a mark. There were no night chains on any of the apartment doors in question, and the record is devoid of any evidence to show that any marks were found.

The defendant testified that he and his wife had arrived in Oakland about midnight September 13, 1963, on the return trip to his home in Los Angeles from a visit to his ailing father in Camas, Washington; that with his brother and the latter's wife, who came in another car, they took separate rooms at the Fairview Motel, about 6 or 8 blocks away from where he was apprehended; that being unable to sleep, he went for a walk, found the black bag, and was examining its contents—trying the gloves for fit, and putting things in his pockets as he pulled them out—when he heard a commotion; that he looked up and saw two men running, and he started to run; and that when they identified themselves as officers, he stopped and was taken into custody. He denied he had ever been in apartment 002 at 271 Vernon Street, and stated that the three pairs of socks found in his pocket came from the black bag he had picked up.

He denied that Officer Hoover was present at the scene of his original apprehension, and that any officer questioned him at that point. He stated that when questioned in front of the premises he told the officers he was not a burglar and denied vehemently that he had anything to do with a burglary. He admitted that he failed to answer questions concerning his name and address, and that he had not given the officers the account of his activities he recited from the witness stand.

His wife verified his activities to and including their registering at the motel in Oakland, and two former fellow employees vouched for his character.

1. *Evidence of the questions propounded to defendant and his ensuing conduct was properly admitted.*

Defendant assumes that all of the questions propounded to defendant by both officers are accusatory statements, and that it was error to admit them and his conduct in response thereto because of his right to remain silent under the federal and state Constitutions. He appeals to three separate, although related, legal principles, as demonstrating the error of the trial court (see *People* v. *Simmons* (1946) 28 Cal.2d 699, 721 [172 P.2d 18]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 342-357 [42 Cal.Rptr. 169, 398 P.2d 361]; and *Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]), but no one of them is controlling here.

Before examining his arguments it is proper to analyze the nature of the evidence of which complaint is made. █ The questions directed to defendant concerning his name, where he was going in such a hurry, his address, whether he lived in the area, with whom he had been, and whether there was anyone in the area the officer could contact to clear him, contain no accusations which are converted into adoptive admissions by the defendant's silence, unless resort be had to the fact, which was conceded by all, that he was in a hurry when apprehended. The silence here is mere nonassertive conduct; it is not a declaration but a failure to offer an explanation, under circumstances which call for one, which in turn gives rise to an inference of consciousness of guilt. (See Cal. Evid. Code (1965*), §§ 225, subd. (b) and 1200, and Comment, § 1200; cf. 2 Wigmore, Evidence, §§ 273, 276, pp. 106-111; and Witkin, Cal. Evidence (1958) § 214, p. 239; with 4 Wigmore, Evidence, §§ 1071-1072, p. 70, et seq.; and Witkin Cal. Evidence (1958) §§ 235-237, pp. 266, et seq.)

█ On the other hand the failure to deny the accusation, when Fiege advised the defendant that he was under arrest for investigation of burglary, and asked him if he had anything to say for himself, could give rise not only to an inference of consciousness of guilt, but also an adoptive admission that the charge was true. (See Code Civ. Proc., § 1870, subd. 3; Cal. Evid. Code (1965), § 1221; and texts last cited.)

(A) In *People* v. *Simmons, supra,* 28 Cal.2d 699, at page 721, the opinion points out it is an abuse of discretion on the part of the trial court to admit statements of the defendant's woman friend and a codefendant which tended to incriminate defendant where it was obvious from his responses, on being confronted with these statements—''I told you all I am

---

*Reporter's note: The code is to become operative on January 1, 1967.

going to tell you,'' etc.—that he was attempting to exercise his constitutional privilege against self-incrimination. (See also *Martinez* v. *Superior Court* (1964) 224 Cal.App.2d 755, 757-759 [37 Cal.Rptr. 115].)

The opinion lays down the general rules as to the use of accusatory statements as follows: ''Accusatory statements of the character here involved are plain hearsay. They may properly find their way into the record only as admissions, under the familiar exception to the hearsay rule. If the accused responds to the statement with a flat denial, there is no admission and hence nothing that may be received in evidence. If, on the contrary, the truth of the statement is admitted, the statement may properly be introduced. A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply. In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt.

''The theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial. Where his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness. Where the trial judge determines that such an inference may be drawn, the statement is then admitted, not as substantive evidence in proof of the fact asserted but merely as a basis for showing the reaction of the accused to it.'' (28 Cal.2d pp. 712-713; see also *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 261-262 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v. *Davis* (1957) 48 Cal.2d 241, 249-250 [309 P.2d 1]; *People* v. *Davis* (1954) 43 Cal.2d 661, 669-672 [276 P.2d 801]; *People* v. *De Leon* (1965) 236 Cal.App.2d 530, 535 [46 Cal.Rptr. 241]; *People* v. *Stewart* (1965) 236 Cal. App.2d 27, 33 [45 Cal.Rptr. 712]; *People* v. *Atwood* (1963) 223 Cal.App.2d 316, 329-331 [35 Cal.Rptr. 831]; *People* v. *Flynn* (1963) 217 Cal.App.2d 289, 295-296 [31 Cal. Rptr. 651].)

 Here the court properly passed on the admissibility of the evidence and the jury was correctly instructed, sub-

stantially as suggested in *Whitehorn* (60 Cal.2d at p. 261, fn. 1), and in *Atwood* (223 Cal.App.2d at p. 328, fn. 5). No violation of *Simmons* appears on the record. Defendant suggests that the defendant's silence is of itself an indication of his claim to the constitutional privilege against self-incrimination, and that therefore no accusatory statement or other question can be used. This argument was made and rejected in *Flynn* (217 Cal.App.2d at p. 296; and see *Atwood,* 223 Cal.App.2d at p. 331).

Furthermore, as pointed out above the only implied admission used against him was that arising from his failure to deny the accusation after the burglary was discovered. ■ It is recognized that, "There is, of course, nothing unreasonable in an officer's questioning persons outdoors at night [citations], and it is possible that in some circumstances even a refusal to answer would, in the light of other evidence, justify an arrest. [Citation.]" (*People* v. *Simon* (1955) 45 Cal.2d 645, 650 [290 P.2d 531].) The cases setting forth the California rule permitting temporary detention for questioning are set forth in *People* v. *Machel* (1965) 234 Cal.App.2d 37, 43-44 [44 Cal.Rptr. 126]. In fact since 1961 it has been provided by statute: "Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor; . . . (e) Who loiters or wanders upon the streets or from place to place without apparent reason or business and who refuses to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification." (Pen. Code, § 647, subd. (e); and see *People* v. *Bruno* (1962) 211 Cal.App.2d Supp. 855, *passim* [27 Cal. Rptr. 458].) ■ If there is such a right to interrogate, the results of such interrogation should be available where they reflect conduct on the part of the defendant which tends to establish his guilt unless there is a supervening policy of the law which prevents the use of the conduct or statements of the accused.

■ (B) Defendant contends that the principle established in *People* v. *Dorado, supra,* 62 Cal.2d 338, 342-357, which precludes the use of a defendant's statements against him under the circumstances therein outlined, now prohibits the use of a defendant's silence under similar circumstances. This, of course, may well be true in regard to any adoptive admission or attempt to use the defendant's silence or

evasive conduct to show that the declarations of another are true. (See *People* v. *De Leon, supra,* 236 Cal.App.2d 530, 536-538; *People* v. *Stewart, supra,* 236 Cal.App.2d 27, 30-33.) The juxtaposition of *Simmons* and *Dorado* was envisioned by Justice Carter in the former case when he suggested that the defendant when being interrogated in the accusatory stage should be cautioned that his reaction to an accusatory statement would be used against him. (28 Cal.2d pp. 718-719.) *Stewart* points out that it is inconsistent to state on the one hand that the defendant should be advised of his constitutional right to remain silent, and yet at the same time permit that silence to be used against him as evidence of his guilt. (236 Cal.App.2d at p. 33.)

The facts here, however, do not come within the proscription of *Dorado.* The defendant was in custody, either under arrest, or perhaps, until the burglary was discovered, merely being detained for investigation. The investigation had focused on him, although at the outset it may not have been clear just what, if any, offense had been committed. He was not effectively informed of his right to counsel and of his right to remain silent. He had not waived those rights, and in fact did remain silent for reasons which were unexpressed and best known to himself.

Two circumstances distinguish this case from *Dorado* and from *Stewart* and *De Leon.* Because the questions propounded to defendant before the discovery of the burglary were not accusatory statements, there is no attempt to foist the declarations of others on the defendant as his own admissions. The defendant's failure to respond to inquiries concerning his name, address, destination, companions, if any, and acquaintanceship in the neighborhood is, as pointed out above, in no sense the adoption of declarations of another. No declarations or statements of the defendant are involved, and his silence cannot be distinguished in this regard from his other nonassertive conduct in fleeing from the scene and twice previously refusing to obey the officers' commands to halt.

Circumstances may be imagined where answering the type of question here involved would violate the provision against self-incrimination which has been extended to nontestimonial compulsion. (See *People* v. *Dorado, supra,* 62 Cal.2d at p. 352, applying *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; and *People* v. *Stewart, supra,* 236 Cal.App.2d 27, 30.) *Dorado,* however, recognizes: "Noth-

ing that we have said, of course, should be interpreted to restrict law enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions." (62 Cal.2d at p. 354.) So here appears a second distinction between the facts of this case and those of *Dorado, Stewart* and *De Leon.* The circumstances here reflect that at the time the preliminary questions were asked the officers did not know what crime, if any, had been committed. The questions were not designed to elicit incriminating statements, but to afford the defendant an opportunity to explain his presence and actions. Therefore, even if the probative facts elicited be deemed extrajudicial statements, as distinguished from nonassertive conduct, they are admissible as admissions obtained before the authorities had commenced a process of interrogation that lent itself to eliciting incriminating statements. In *People* v. *Cotter* (1965) 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862], the opinion recites: "The more crucial conversation (the fourth) with the officers in the police car, was admissible for the further reason of absence of one of the conditions deemed essential to render the statement inadmissible under the rules laid down in *Escobedo, Dorado* and *Stewart.* Clearly, the statement made in the police car was not the product of a process of interrogation aimed at eliciting incriminating statements from defendant. The police merely asked him what had happened at the Buus residence. They were affording him an opportunity which police officers normally and routinely offer to any person whom they are taking into custody to give any explanation of his conduct which he may desire to give. It is a routine means of commencing an investigation."

If the defendant's express admissions at this stage of the investigation may be admitted, he should also be held accountable for such "admissions" as properly may be inferred from his conduct. The foregoing principle not only covers the evidence of the original interrogation by both officers to which defendant failed to respond, but also the original question after the burglary was discovered when he was asked if he had anything to say for himself and ultimately allegedly responded, " 'Was there a burglary committed in that building?' "

(C) Finally defendant contends that *Griffin* v. *California, supra,* 380 U.S. 609, requires a reappraisal of the rule which permits evidence of conduct, more particularly silence, of the

defendant to be admitted as evidence of consciousness of guilt. (See *People* v. *Stewart, supra,* 236 Cal.App.2d 27, 30-31.) █ *Griffin* holds that the Fifth Amendment privilege against self-incrimination is violated by a rule which permits comment on the defendant's failure to take the stand and testify in his defense. The rule on its face does not apply to commentary on defendant's conduct prior to the trial. It is already established by *Simmons* that no inferences may be drawn from an accused's failure to offer an explanation where he rests it on the privilege to remain silent. *Dorado,* as noted above, extends the prohibition to the situation where the elements of that case are present either because the defendant was warned of his right to remain silent and so rests on that privilege, or because he should have been warned of that right and the failure to warn taints all that is elicited from the accused thereafter. Nothing in *Griffin* requires the rejection of the inference to be drawn from the accused's nonassertive conduct, or from his silence prior to the accusatory stage when it is not rested on constitutional grounds. The considerations of reasonable investigation, sanctioned by *Dorado,* should control.

II. *The items found in defendant's possession were admissible in evidence.*

Defendant contends that of the items found in his possession only the socks should have been admitted in evidence. This objection goes to the black silk sack, black gloves, the pen-lights—one in his hand and one in the sack—the watch cap, the bolt cutters and the three plastic strips. The court excluded the bolt cutters, and defendant's argument is confined to the plastic strips, so the remaining articles do not require individual attention. Although the bolt cutters themselves were not admitted into evidence, the testimony that they were found on the defendant's person was never stricken. The propriety of the action of the prosecution in establishing and subsequently referring to defendant's possession of this tool is involved.

█ "As a general rule, physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation." (*People* v. *Bannon* (1922) 59 Cal.App. 50, 56 [209 P. 1029]; and see Code Civ. Proc., § 1954; *People* v. *Trujillo* (1948) 32 Cal.2d 105, 115 [194 P.2d 681]; *People* v. *Green* (1939) 13

Cal.2d 37, 43 [87 P.2d 821]; and *People* v. *Lindsay* (1964) 227 Cal.App.2d 482, 497-501 [38 Cal.Rptr. 755].)

An early decision of the Supreme Court upheld the admission and exhibition as evidence of burglarious tools which were found in the defendant's carpet bag at the time of his arrest, because the record failed to show that they did not tend to connect the defendant with the burglary in question. The court stated:

"Burglarious tools found in the possession of the defendant soon after the commission of the offense may be offered in evidence whenever they constitute a link in the chain of circumstances which tend to connect the defendant with the commission of the particular burglary charged in the indictment. But before they can be received it must be shown that the burglary charged was in fact committed. When this has been done nothing remains but to ascertain who was the guilty party; or in other words to connect the defendant with the burglary thus established. It rarely happens that this can be done by the direct evidence of witnesses who saw and recognized the defendant in the act; hence in a majority of cases a resort must be had to circumstantial evidence, and any circumstances of which it can be reasonably affirmed that they form links in a chain which tends to connect the defendant with the commission of the burglary are competent evidence against him; but circumstances of which this cannot be affirmed are not. Hence the possession of burglarious tools at or about the time the burglary was committed may or may not be a material fact and competent for the prosecution to prove, and whether it is or not depends necessarily upon the other circumstances of the case. In order to render it material there must be a possible and probable connection between it and the other circumstances given in evidence. If it appears from the other evidence in the case that the defendant was in the vicinity at or about the time the burglary was committed and that it was committed by the aid of burglarious tools, the possession by the defendant, at or about that time, of corresponding tools may be shown, because by such evidence it is shown that the defendant had the means to commit the offense in the mode in which it was committed and because the possession of the means by which the offense was actually committed is a circumstance which tends when other circumstances do not oppose but agree with it, to connect the accused with the commission of the offense. But if it appears from other evidence that the burglary was not committed by

means of burglarious tools, as where the burglar has entered by an open door or window, the possession of burglarious tools cannot be shown; because, so far as the case shows, there is no connection, probable or possible, between it and an offense confessedly committed without the aid of such tools.'' (*People* v. *Winters* (1866) 29 Cal. 658, 659-660.)

 Defendant asserts that none of the objects found on his person other than the socks were shown to have been connected with burglary, and that therefore their admission was improper under the principle last set forth in the above quotation. (See *People* v. *Sansome* (1890) 84 Cal. 449, 453-455 [24 P. 143].) He points to the fact that no marks were left on the doorways. This overlooks the testimony of Officer Miller to the effect that the strips taken from the defendant were burglar tools used to slip a lock on a door; that they were adapted to and in fact could be used to open the door to the apartment building and the door to apartment number 002; and that they usually do not leave a mark. The testimony as to the experiments with the strips was properly admitted. (*People* v. *Sturman* (1942) 56 Cal.App.2d 173, 181 [132 P.2d 504]; *People* v. *Savage* (1936) 14 Cal.App.2d 142, 144 [57 P.2d 973].) It is clear that the tools have a high probative value and are properly admissible where they are shown to have a physical connection with the means used to effect the entry. (*People* v. *Wilkes* (1955) 44 Cal.2d 679, 683 [284 P.2d 481]; *People* v. *Godlewski* (1943) 22 Cal.2d 677, 685 [140 P.2d 381]; *People* v. *Hope* (1882) 62 Cal. 291, 294-295; *People* v. *Lindsay, supra,* 227 Cal.App.2d 482, 497; *People* v. *Weems* (1961) 197 Cal.App.2d 405, 410 [17 Cal.Rptr. 50]; *People* v. *Nichols* (1961) 196 Cal.App.2d 223, 227 [16 Cal. Rptr. 328]; *People* v. *Cartier* (1959) 170 Cal.App.2d 613, 616 [339 P.2d 172].) The tools also are properly admitted if they are reasonably adapted to the performance of the entry which is in fact effected. (*People* v. *Hope, supra,* 62 Cal. 291, 294; *People* v. *Clinton* (1926) 78 Cal.App. 451, 454 [248 P. 929]; *People* v. *Trujillo, supra,* 32 Cal.2d 105, 116; and see *People* v. *Lindsay, supra,* 227 Cal.App.2d 482, 499; *People* v. *Peete* (1921) 54 Cal.App. 333, 347-351 [202 P. 51].) There was no error in admitting the strips.

 Some cloud is thrown on the admission of the other articles by the statement in *Winters, supra,* on which defendant relies. (See also *People* v. *Sansome, supra,* 84 Cal. 449, 453-455; *People* v. *Nichols, supra,* 196 Cal.App.2d 223, 227-228; and *People* v. *Miller* (1957) 150 Cal.App.2d 212, 213-

214 [309 P.2d 494].) Defendant fails to consider the circumstances of this case. The articles were not secured in connection with an arrest removed in time and distance from the offense, but one immediately connected with the alleged illegal act. Under such circumstances evidence of the possession of articles—sack, gloves, pen-lights, watch cap, and bolt cutters—reasonably adapted to use in connection with the commission of a burglary whether so used or not, is properly admissible as showing defendant's felonious intent. (*People* v. *Gibson* (1949) 94 Cal.App.2d 468, 470, 471-472 [210 P.2d 747]; *People* v. *Sturman, supra,* 56 Cal.App.2d 173, 180-181; and see *People* v. *Weems, supra,* 197 Cal. App.2d 405, 410.)

It is concluded that all of the articles offered by the prosecution were properly admissible into evidence.

III. *The exhibition of the articles prior to their admission in evidence did not constitute prejudicial error.*

 Defendant asserts that the trial court erred in permitting the district attorney to keep several items of evidence on the counsel table in front of him and in full view of the jury prior to the introduction of any testimony regarding them, or their being marked for identification, or admitted into evidence. His failure to point out any transcript reference where allegedly erroneous rulings were made, renders it unnecessary to give this argument any consideration. (Cal. Rules of Court, rule 15(a); *People* v. *Meyer* (1963) 216 Cal. App.2d 618, 635 [31 Cal.Rptr. 285].)

It has been noted, however, that the defendant early in the trial, while the victim was identifying his socks, requested: ''Will counsel be further directed not to place on counsel table such exhibits as he may have until or unless they have been produced into evidence?'' The items in question were not identified except as ''certain pieces of what appear . . . to be material.'' Subsequently a similar objection went to the gloves, the black bag, some socks and a hat. The court indicated they should not be so exhibited if not relevant, but permitted the prosecutor to proceed as he deemed advisable in regard to relevant articles. A final objection was made to articles on the counsel table which were thereupon exhibited to Officer Hoover and identified by him as having been removed from the possession of the defendant.

The point involved is not a question of trial technique and order of proof. It involves balancing possible prejudice, in

the event articles of a highly inflammatory or prejudicial nature, which are subsequently found inadmissible, are exhibited before the jury, with the necessity of proceeding with the trial in an orderly, efficient, and timely manner without unwarranted interruptions for the purpose of reviewing each item of evidence out of the presence of the jury. The exhibition of improper materials to the jury should not be condoned. (See *Page* v. *State* (1949) 208 Miss. 347, 361-363 [44 So.2d 459, 465]; and *Helton* v. *Mann* (1942) 111 Ind.App. 487, 500 [40 N.E.2d 395, 400-401].) On the other hand insofar as the articles are admitted into evidence, no error can be shown and no possible prejudice can result. The exhibition of the bolt cutters, despite the fact that they were not admitted in evidence, cannot be the basis of error, because, as has been indicated, the trial court could have admitted them in evidence. (See *People* v. *Miller, supra,* 150 Cal.App.2d 212, 214; and cf. *People* v. *Gibson, supra*; and *People* v. *Sturman, supra.*) Furthermore, the testimony that they were found on the defendant was never stricken from the record, and the error, if any, in exhibiting what was properly referred to verbally could not be prejudicial.

IV. *There was no error in referring in argument to defendant's possession of the bolt cutters.*

 Defendant refers to numerous occasions on which the prosecutor in making his argument to the jury referred to the fact that defendant had the bolt cutters in his possession when apprehended. It is error, and may be prejudicial, to refer to an article as though it were utilized in the commission of an offense, if, despite a reference to it in the testimony, it was not admitted into evidence and not connected up with the crime in question. (*People* v. *Evans* (1952) 39 Cal.2d 242, 246-247 and 251-252 [246 P.2d 636].) In the instant case, however, the article mentioned in the argument was in fact connected up with the defendant at about the time of the commission of the offense. For the reasons set forth above it was not error to admit testimony of this fact, and it was not error to refer to that testimony even though the article itself has been, albeit erroneously, excluded. (*People* v. *Amaya* (1901) 134 Cal. 531, 539 [66 P. 794]; *People* v. *Costa* (1956) 145 Cal.App.2d 445, 447 [302 P.2d 634].)

The appeal from the order denying the motion for new trial is dismissed, and the judgment (and the sentence as merged therein) is affirmed.

Sullivan, P. J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 26, 1966. Peters, J., was of the opinion that the petition should be granted.