Filed 8/29/23  P. v. Marsh CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>      v.<br><br>MARCUS EDWARD MARSH,<br><br>   Defendant and Appellant. | G061639<br><br>(Super. Ct. No. 93WF1745)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed.

David W. Beaudreau, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

This is Marcus Edward Marsh's second appeal from an order rejecting his petition for resentencing pursuant Penal Code[1] section 1170.95 (later renumbered section 1172.6). His first appeal challenged the trial court's dismissal of his petition without conducting a hearing. We reversed that order and remanded the case with directions to conduct an evidentiary hearing addressing Marsh's contentions that he was not the actual killer of two people during a 1992 home invasion robbery, and also that he did not qualify as a major participant in the robbery/burglary who acted with reckless indifference to human life.

On remand, the court held the evidentiary hearing and denied Marsh's petition based on the trial record. The court concluded the evidence demonstrated Marsh was a major participant in the robbery/burglary underlying the murders, and that he had acted with reckless indifference to human life.

In this appeal, Marsh argues (1) because we are reviewing the same documentary record as the trial court did, we should apply a de novo standard in reviewing whether the evidence established Marsh was a major participant and acted with reckless indifference to human life; (2) the court's findings were not supported by substantial evidence; (3) the court erred by treating the hearsay statements of his codefendant as adoptive admissions; and (4) the court erred by considering character evidence that was excluded at trial.

We find no merit in any of these contentions. We therefore affirm. We conclude, as have the other appellate courts that considered the issue, the substantial evidence standard is the appropriate standard to apply in reviewing the trial court's finding of facts in deciding a resentencing petition under section 1172.6. The trial record included evidence that Marsh was one of three participants in the robbery/burglary, and

---

[1] All further statutory references are to this Code, unless otherwise designated.

one of the two who entered the victims' home. That record also contained evidence Marsh had possession of the gun used to kill the victims, and he used it to shoot the male victim, nonfatally. Even assuming it was not Marsh who later fired the fatal shot, the court could infer he relinquished the gun to his codefendant for that purpose. Marsh then shared in the spoils of the robbery. Those facts are sufficient to support the court's ruling.

Marsh's challenge to the court's reliance on the statements made by his codefendant, Ralph Dennis, fails because the sufficiency of the evidence to prove the elements of an adoptive admission was established through application of law of the case. This court made that determination in Marsh's original appeal from the judgment, and that decision is binding in this appeal.

And finally, Marsh's challenge to the court's purported reliance on "character" evidence that was not admitted at trial fails because he forfeited the argument when his lawyer failed to object in the court below. We reject his claim that the failure to object amounted to ineffective assistance of counsel because, when the court's remark is viewed in context, it is apparent that the court was not considering the evidence for the improper purpose Marsh now suggests.

## FACTS

Marsh and Dennis were convicted of two counts of murder that occurred during a burglary/robbery of a drug dealer. This court's prior opinion on appeal from the judgment describes the circumstances of the murders: "Sherryl Madison rented a townhome along with Walid Mallalah. The two frequently smoked marijuana together. Madison also knew Dennis and he stayed at the townhome from mid-October to mid-November 1992. In early November, Madison heard Mallalah and Dennis discuss robbing a drug dealer who kept large amounts of both money and marijuana in his home, and also had a gun collection. On the morning of November 17, Mallalah borrowed

3

Madison's car taking Dennis with him.  Later, Mallalah telephoned Madison and asked if anyone had called for him or Dennis.  She replied no, and Mallalah said he had paged someone to call him at the townhome.  A few minutes later, a man called and Madison directed him to Mallalah's location.

"Sometime after 7:30 a.m., [the victims] were shot to death in [the] home.  A safe was open and several guns were lying on the ground.  Among the missing property items were a .357 magnum handgun and a Spectre semiautomatic pistol.

"When Mallalah returned home, he was upset and perspiring. Madison asked what happened and he replied, 'Don't ask.'  A short time later, Madison saw Mallalah, Dennis and Marsh in the townhome's garage along with bags of marijuana and guns.  A late model white Pontiac was also parked in the garage.  Each defendant had a hard look on his face and appeared pumped up.  When Madison asked what happened, Dennis told her they had gone to [the victims'] house and, while Mallalah remained outside as a lookout, he and Marsh kicked in the front door, ordered [one victim] to open the safe and then killed both him and [the other victim].  Marsh complained Mallalah should not share in the division of the loot because his diagram of [the home] was inaccurate.  Mallalah argued that, but for him, they would not have known about the house.  Dennis resolved the dispute by saying Mallalah would receive his share." (*People v. Marsh et al.* (Sept. 30, 1996, G017229) [nonpub. opn.] (*Marsh I*).)

The amended information alleged crimes against Marsh and Dennis only because Mallalah had left the country.[2]  The amended information drew no distinctions between the two defendants, alleging that both Marsh and Dennis were guilty of murder in the killing of Robert Klecker (count 1) and Karen Stevens (count 2).  It further alleged

---

[2]  In January 1993, Mallalah apparently returned to his native country of Kuwait.  (*Marsh I, supra,* G017229.)

4

that each defendant was vicariously armed in the commission of the murders and knew that another principal was armed.

At trial, the prosecutor made no effort to prove that either defendant was the actual killer (*Marsh I, supra,* G017229.), and the jury was not asked to make any findings concerning their relative culpability.

On January 14, 2019, Marsh filed his first petition for resentencing pursuant to section 1170.95 (renumbered 1172.6).  In that petition, Marsh asserted he was not the actual killer; he also denied he was a major participant in the underlying felony who acted with reckless indifference to human life during the course of the felony. (*People v. Marsh* (Aug. 11, 2021, G059355) [nonpub. opn.] (*Marsh II*).)

"The trial court denied the petition without an evidentiary hearing after concluding the jury in Marsh's trial had necessarily found he was either the actual killer of the two victims or had been a major participant in the robbery/burglary who acted with reckless indifference to human life."  (*Marsh II, supra*, G059355.)

Relying on *People v. Banks* (2015) 61 Cal.4th 788, (*Banks*), and *People v. Clark* (2016) 63 Cal.4th 522, (*Clark*), which were decided after Marsh's 1994 trial and clarified the requirements for determining whether a defendant qualified as a major participant in the crime (*Banks*) and acted with reckless indifference to human life (*Clark*), we reversed the court's order and remanded the case with directions to hold an evidentiary hearing.  (*Marsh II, supra*, G059355.)

On remand, the court reviewed the entire trial record as it considered whether Marsh was a major participant in the robbery/burglary who acted with reckless indifference to life.  The court concluded beyond a reasonable doubt that he was, and therefore denied Marsh's resentencing petition.

## DISCUSSION

1. *Resentencing Law*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) (Senate Bill 1437), amended the felony murder rule and eliminated the natural and probable consequences doctrine as a means of proving murder. Specifically, Penal Code section 189, subdivision (e), provides that in cases where a death occurs during the perpetration or attempted perpetration of a felony listed in section 189, subdivision (a), the defendant is liable for murder only if the person was the actual killer, the person acted with intent to kill in aiding, assisting or soliciting the killer, or if the person "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).)

Senate Bill 1437 thereafter provided a remedy for persons previously convicted of felony murder or murder under a natural and probable consequences theory. Section 1172.6 permits an individual to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not have been convicted of murder because of Senate Bill 1437's changes to the definition of the crime. The trial court here complied with the statutory requirements as it reviewed Marsh's sentence.

2. *Banks and Clark*

*Banks* established an analytical framework for determining who is a "major participant" in an underlying felony for purposes of establishing the felony-murder special circumstance that renders a defendant eligible for the death penalty, while *Clark* focused on what it means to act with "reckless indifference to human life" in connection with the same issue.

In *Banks*, the Supreme Court emphasized the need to focus on a defendant's "individual culpability" to determine whether that defendant was a major participant who could be found eligible for the death penalty as an aider and abettor.

6

(*Banks, supra*, 61 Cal.4th at p. 801; see *Enmund v. Florida* (1982) 458 U.S. 782, 798, ["The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims"].) "A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra,* at p. 801.)

Banks also stated that to qualify as a major participant, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks, supra*, 61 Cal.4th at p. 802.) In evaluating that issue, the court considers a variety of issues: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? . . . Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?" (*Banks*, at p. 803, fn. omitted.)

In *Clark*, the Supreme Court explained that "reckless indifference to human life" means something more than an awareness that a risk of death is foreseeable in any violent felony. (*Clark, supra*, 63 Cal.4th at p. 617.) Indeed, even "the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used" is not sufficient to establish reckless indifference to human life. (*Banks, supra,* 61 Cal.4th at p. 808; see *Clark*, at p. 623.) "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Id.* at p. 618.)

Rather, reckless indifference "encompasses *a willingness to kill* (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at p. 617, italics added.) Reckless indifference has both a subjective and an objective element.

7

(*Ibid.*)  Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.)  And objectively, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" (*Clark*, at p. 617.)

In applying *Clark*, "[w]e analyze the totality of the circumstances to determine whether [an individual defendant] acted with reckless indifference to human life.  Relevant factors include:  Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?  [Citation.] '"[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient."'" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

3.     *Standard of Review*

Marsh argues we should apply a de novo standard in assessing whether the evidence demonstrates, beyond a reasonable doubt, that he was a major participant who acted with reckless indifference to human life.  He acknowledges that other courts have rejected this argument and instead engaged in a substantial evidence review.  (See, e.g., *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233*; People v. Mitchell* (2022) 8 Cal.App.5th 575, 591*; People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)  Marsh contends those cases are wrongly decided.  We disagree.

8

Marsh argues that because we are reviewing the same "cold" record as the trial court (i.e., one containing documents and transcripts, but no live testimony), we are "equally capable of determining the facts," and "[t]he normal grounds for deferring to a trial court's findings are absent." He relies on *People v. Vivar* (2021) 11 Cal.5th 510, 526-528 (*Vivar*), in which the Supreme Court concluded that the appellate court should apply a de novo standard in reviewing a trial court's decision whether to vacate a conviction due to negative immigration consequences (*Vivar*, at pp. 524-527), for the proposition that "Where, as here, the facts derive entirely from written declarations and other documents . . . there is no reason to conclude the trial court has . . . special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding" (*Id.* at p. 528).

However, as explained in *People v. Oliver* (2023) 90 Cal.App.5th 466, (*Oliver*), the Supreme Court's conclusion in *Vivar* focused on the particular issue being analyzed in that case, and thus, "it's holding was 'a product of multiple factors with special relevance' in that context [citation] and reaffirmed the 'familiar postulate' that "'an appellate court should defer to the factual determinations made by the trial court,"' regardless of "'whether the trial court's ruling[s are based] on oral testimony or declarations."'" (*Id.* at p. 480, citing *Vivar, supra,* 11 Cal.5th at p. 528, fn. 7.)

The *Oliver* court concluded it was bound by *People v. Perez* (2018) 4 Cal.5th 1055. (*Oliver, supra,* 90 Cal.App.5th at pp. 479-480.) In *Perez*, it was the prosecutor who argued "that de novo review was "'more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction."' [Citation.] The Supreme Court disagreed, concluding that 'even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings."' (*Oliver,* at p. 479.)

9

We agree with *Oliver.* Application of the substantial evidence standard is well established. "We '"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.'" [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements, supra*, 75 Cal.App.5th at p. 298.)

       4.     *Substantial Evidence*

In the prior appeal, both parties relied on the appellate opinion to establish the circumstances of the crime, but that opinion never resolved what Marsh knew about the robbery plan, or what acts Marsh actually performed. On remand, the parties relied upon the trial transcript to argue about who did what during the robbery.

At trial, Madison testified that on November 17, 1992, Mallalah arrived at their townhouse first; he was alone. Dennis and Marsh arrived about 15 to 20 minutes later. Madison encountered all three men in a storage room located in the two-car garage below the townhouse. When Madison came into the storage room, the men had bags of marijuana and guns laid out. She asked, directing her question generally to Dennis and Mallalah, "What did you do?" Dennis replied they had accomplished the robbery. Madison then asked what happened. Dennis told her he and Marsh had gone to the victims' house, while Mallalah stayed outside. They kicked in the door, and then Klecker, the male victim, came around a corner with a gun and fired at them. According to Dennis, Marsh then "shot him in the stomach."

10

Dennis said they took the male victim into the room where the safe was and forced him to open it. Madison asked Dennis where the female victim was; he replied she was curled up in a fetal position in the corner. When Madison asked Dennis if he left her alone, he said "no." Madison then asked, "you killed her?" And Dennis responded, "yes."

Dennis also told Madison that after "they" took the male victim into the room where the safe was, "they" made him open the safe, and "they" killed him. She said Dennis did not specify which of the two men pulled the trigger. Madison testified she did not hear Marsh say anything during her conversation with Dennis.

Madison estimated she was in the storage room for between 15 and 30 minutes. During that time, she heard Marsh say he did not think Mallalah deserved a one-third share of the robbery proceeds because the diagram he had provided of the house was inaccurate. Mallalah defended his contribution, noting the others would not have known of the burglary/robbery opportunity if it were not for him; Dennis then ended the conversation by stating "'he's getting a third.'"

According to the testimony of the forensic pathologist, the male victim sustained two gunshot wounds. One was consistent with a bullet traveling through the upper lip and then into the neck, leaving a "copper jacket" in the neck; the other was consistent with a bullet traveling through his hand into his jaw, then transecting the cervical cord and exiting the neck. [3] The pathologist also opined that either bullet wound

---

[3]     The Attorney General concedes this forensic evidence is not consistent with the circumstances described by Dennis, as related in Madison's testimony. Although Madison testified Dennis claimed Marsh's initial shot struck the male victim in the stomach, "there was no forensic evidence of a gunshot wound to [the male victim's] stomach." Instead, "there was forensic evidence of a nonlethal shot to his face." Moreover, "there was no forensic evidence of a shot fired at [Marsh] or Dennis." The forensic evidence showed "only two of three bullets traveling through a pillow at close range," and showed "blood on the outside of [the] bedroom door." Thus, the evidence appears to be consistent with the claim the male victim sustained a single, non-lethal

"[c]ould have" rendered the male victim unconscious and that based on the amount of fluid in his lungs, "presumably 20 minutes" elapsed between the first gunshot wound and the second fatal gunshot wound. The male victim also sustained blunt force trauma to the scalp, abrasions over his right upper brow and eyelid, and a contusion to his left chest. All three bullet casings found at the scene came from the same gun.

We find this evidence sufficient to support the trial court's findings: (1) Marsh was a major participant, and (2) he acted with reckless indifference to human life. As to the former, Marsh was one of two people who entered an occupied home while he was armed. When both men were confronted by the male resident, Marsh shot him. While none of this irrefutably demonstrates Marsh was involved in the planning of the burglary/robbery, *Banks* directs us to focus on his role "in supplying or using lethal weapons," whether he was "present at the scene of the killing," whether he was "in a position to facilitate or prevent the actual murder[s]," and whether his "own actions or inaction play[ed] a particular role in the death[s]." (*Banks, supra*, 61 Cal.4th at p. 803.) The evidence in this record supports the trial court's ruling.

Marsh argues that some of this evidence should be disregarded because other evidence supports less culpable inferences. For example, he claims the evidence that a nine-millimeter pistol—the same caliber used in the killings—was stolen *during* the robbery suggests Marsh was not armed when he entered the house. The argument fails because in a substantial evidence review, we are required to indulge the inferences which support the trial court's ruling and to ignore those which do not.

Marsh also argues Madison's testimony about Dennis identifying him as the initial shooter of the male victim was not substantial or credible because she claimed to have been told Marsh shot him in the stomach, which was not borne out by the forensic

---

gunshot wound outside the bedroom, before each victim was lethally shot once inside the bedroom through the pillow.

evidence. He further asserts that neither the prosecutor at trial nor the court below on rehearing credited her claim. We are not persuaded.

As we have already noted, while the forensic evidence indicated where the first shot hit the male victim, it also confirmed the basic scenario Madison described that the two bullet wounds sustained by the male victim came 20 minutes apart. As for Marsh's contention that the trial court did not credit Madison's testimony on rehearing, we disagree. In its ruling, the court specifically recited the facts from her testimony: "Klecker came around the corner. And I believe—correct me if I'm wrong—that he was shot at that point. Maybe not in the—where they said he was shot, but he had, I thought, a gunshot wound on his hand."[4]

The evidence also supports the trial court's conclusion that Marsh acted with reckless indifference to human life: "the subjective element [of reckless indifference requires] '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

_____

[4] Marsh's contention that the trial prosecutor did not credit the statement is unpersuasive as well. Under the law as it existed at the time, the trial prosecutor was not required to prove the individual culpability of Marsh or Dennis, and thus the failure to distinguish between them is insignificant. We do not assess credibility on appeal. Because the evidence was in the record, and it is not inherently improbable, it is properly considered as part of our substantial evidence review. (*State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1626, fn. 5 ["[A]n appellate court may not reweigh the evidence and may not reject evidence as lacking credibility unless it is physically impossible [citations] or inherently implausible"].)

13

"The reckless indifference considerations "'significantly overlap'" with the major participant considerations, "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life."'" (*People v. Nieber*) (2022) 82 Cal.App.5th 458, 478.)

The evidence in this case supports the conclusion that Marsh was aware of and willingly involved himself in the violent nature of the offense. While there is no evidence Marsh himself personally killed the male victim, the court could reasonably infer he at best failed to aid the victim when he had the opportunity to do so. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 593 [substantial evidence supported a finding of reckless indifference "[o]nce the gunfire started, [the defendant] worked to complete the robbery, not to care for the victim"].)

Marsh argues the fact the robbery was planned for the daytime, rather than at night when the male victim's children would be home, shows a plan to "minimize the risk of violence." Again, we disagree. While that plan may have reduced the risk that the children would be caught in any violence, it did nothing to minimize the risk that the crime would lead to life-threatening violence.

Marsh argues his relative youth (22 years of age at the time of the crime) was a factor weighing against the conclusion that he appreciated the risks associated with the crime. (See *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990-991 and *In re Moore* (2021) 68 Cal.App.5th 434, 454.) But even if that were true, it does not undermine the sufficiency of other evidence to support the court's conclusion.

In our view, this case is similar to *In re McDowell* (2020) 55 Cal.App.5th 999 (*McDowell*), in which the appellate court concluded the evidence was sufficient to support the finding of reckless indifference. In *McDowell*, the defendant planned a home invasion robbery of a drug dealer. He entered the home armed with a knife, which he brandished during the offense. Because the robbery took place during daytime, it was foreseeable that customers or others might be present and that the dealer or his customers

14

might be armed or high, elevating the risk of resistance. When the defendant and his partner entered the home, they saw they were outnumbered but did not abandon their plan. (*Id*. at p. 1013.) Instead, when faced with resistance, the defendant's cohort drew a gun and fired a warning shot. (*Id*. at p. 1014.) Even then, the defendant did not say or do anything to deescalate the situation or restrain his crime partner. After the cohort shot and killed the victim, the defendant fled with him. (*Ibid*.)

Here, as in *McDowell*, the planned crime was a daytime home invasion robbery of a drug dealer. Whether or not Marsh was involved in the planning stage, the court could reasonably infer that he agreed to participate in the robbery with knowledge of the plan devised by Mallalah and Dennis. Marsh's own statement, according to Madison's testimony, revealed he received a diagram of the home, and his sole complaint after the crime was that the diagram was inaccurate. He did not suggest he was otherwise misled in any way.

Marsh otherwise contends *McDowell* is distinguishable because "[n]o evidence shows Marsh armed himself." No so. Whether the gun used to kill the victims was one Marsh brought with him, or (as he suggests) it was found at the scene, the evidence is Marsh "armed himself" with it and then used it to shoot the male victim.

Finally, Marsh insists that a lack of affirmative evidence detailing exactly what he did before and during the murders somehow requires both the trial court and this court to assume he acted with greater regard for human life than did the defendant in *McDowell*. Again we disagree. The evidence here is that it was Marsh who initially possessed the gun used to kill the victims; he was therefore in a better position than the *McDowell* defendant to control the violence inflicted by that gun.

Based on the foregoing, we find the court's factual conclusions were supported by sufficient evidence.

15

5.    *Evidentiary Rulings*

a.    Admission of Dennis's Hearsay Statements

At the evidentiary hearing, Marsh sought to exclude evidence of Dennis's hearsay statements to Madison. He argued the statements did not qualify as his adoptive admissions (see Evid. Code, § 1221) because substantial evidence did not demonstrate he had an opportunity to hear or object to Dennis's statements. He now argues the court erred by admitting the evidence.

An adoptive admission is a "statement offered against a party . . . which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) Thus, admissibility turns on the party's awareness of the statement and his response to it.

"'"'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.'"'" (*People v. Jennings* (2010) 50 Cal.4th 616, 661.) "'The theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial.'" (*People v. Wilson* (1965) 238 Cal.App.2d 447, 457.)

Marsh analogizes this case to *People v. Lebell* (1979) 89 Cal.App.3d 772, 779-780, in which the appellate court considered whether the statements made by a third party in a telephone conversation with the testifying witness could be considered the adoptive admissions of the defendant based on evidence that the witness could hear the defendant's voice in the background during the call. In that case, the court concluded the evidence was insufficient because "there was nothing from which it could reasonably have been surmised [the defendant] heard what [the third party] said or that, if he did,

16

there was any reason or opportunity for him to respond to [that person's] statements." (*Id.* at p. 780.)

The Attorney General argues that Marsh's objection to the evidence was forfeited when he failed to object to its admission during the trial. But the Attorney General also points out that Marsh argued in his initial appeal that Madison's testimony about Dennis's statements were "admissible against him only as an adoptive admission" and claimed that as a consequence "the trial court [had] erred by failing to read CALJIC No. 2.71.5 to the jury." (*Marsh 1, supra,* G017229.)

In assessing that argument in *Marsh I*, this court concluded that "[u]nder the circumstances *it is inferable Marsh was standing nearby and heard both Madison's question and Dennis' answer*." (*Ibid.*, italics added.) Under the doctrine of law of the case, that determination precludes Marsh from now contending the record is insufficient to support those same conclusions.

"Under the law of the case doctrine, when an appellate court '"states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal. . . .'" [Citation.] Absent an applicable exception, the doctrine 'requir[es] both trial and appellate courts to follow the rules laid down upon a former appeal whether such rules are right or wrong.'" (*People v. Barragan* (2004) 32 Cal.4th 236, 246 (*Barragan*).)

"As its name suggests, the doctrine applies only to an appellate court's decision on a question of law; it does not apply to questions of fact." (*Barragan, supra*, 32 Cal.4th at p. 246.) However, it applies here because a court's sufficiency of the evidence determination is a question of law, rather than fact. (*Ibid.* ["an appellate court's determination 'that the evidence is insufficient to justify a finding or a judgment is necessarily a decision upon a question of law'"].) Consequently, "[s]uch a determination

17

'establishe[s] as the law of the case that all the evidence adduced at the previous trial was insufficient as a matter of law to establish' the finding or judgment." (*Ibid*.)

This court's prior determination that the trial court record was sufficient to support the inferences that Marsh heard both Madison's question to Dennis and Dennis's answer qualifies as law of the case; it is therefore binding on Marsh in this proceeding which is based on the same trial court record. (*People v. Mattson* (1990) 50 Cal.3d 826, 850 [the appellate court's binding legal determination "controls the outcome only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based"].) We consequently find no error in the trial court's conclusion that Madison's testimony about Dennis's statements to her were admissible against Marsh as adoptive admissions.

b.       Character Evidence

Marsh also argues the court erred by improperly relying on evidence of Marsh's bad character that had been excluded from trial.

At trial, the court rejected the prosecutor's attempt to admit evidence from a person who claimed Dennis had asked her if she knew any criminals "for the purpose of . . . jack[ing] someone," and that she had given him Marsh's beeper number in response. The court reasoned the evidence should be excluded because it showed Marsh's "propensity" and "character for criminal conduct."

In connection with the evidentiary hearing on Marsh's resentencing petition, the prosecutor submitted the entire reporter's transcript of Marsh's jury trial, which included the record of the prosecutor's proffer. Although neither party referenced the proffer in its pleadings or argument, the court mentioned it when explaining its view of the evidence pertaining to Marsh's role in the planning of the crime—part of its analysis on the issue of whether Marsh was a "major participant": "I don't know the role, if any, that this defendant played in the planning of the crime. [¶] Obviously, he knew there was a crime that was going to be committed because he met them at that time

18

and place.  [¶]  My recollection of the testimony at trial—and I can't remember who said it—was that at one point, one party asked somebody else if they knew somebody that was kind of a bad person or a criminal type person.  And they gave Marsh's number.  [¶] Then somebody called back at a later time and said, 'did you give information about Marsh to somebody?'  And they said, 'yes.'  So that was also kind of an inference that I used in there."

Marsh argues this passage demonstrates that the court impermissibly considered "character evidence" to draw a negative inference about him, and that the error was prejudicial.  The Attorney General counters by asserting the claim of error is forfeited because Marsh did not object in the trial court.  We agree.[5]  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353.)  Moreover, "'[i]t is axiomatic that arguments not raised in the trial court are forfeited on appeal.'"  (*Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670.)

Marsh acknowledges his failure to object below, but responds by asserting his counsel's failure to do so constituted ineffective assistance of counsel.  (See *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 ["a defendant asserting ineffective assistance of counsel must demonstrate '(1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness,

---

[5]     This is an ideal example of the kind of error that can be remedied if a timely objection is made.  The trial court acknowledged that its recollection of the evidence was vague ("I can't remember who said it"), and had Marsh's counsel pointed out that the evidence was not from a witness, but from a proffer, the court could have easily reconsidered its significance.

and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome'"].)

We cannot agree. When viewed in context, the insignificance of the court's reference to the proffered evidence becomes apparent. The trial court lead off with its conclusion: "I don't know the role, if any, that this defendant played in planning the crime." It then discussed the limited amount of evidence offered at trial pertaining to how Marsh became involved in the crime. When the court finished by saying "that was . . . kind of an inference that I used in there," it did not identify what inference it was referring to. Instead, it moved on to the next factor in its analysis. "The role the defendant played in supplying lethal weapons—I don't know."

The only thing we know therefore is that the court's reference to the proffered "character" evidence came up in the context of its determination that "I don't know the role, if any, that this defendant played in planning the crime." That is a neutral determination at best which could not have prejudiced Marsh.

There is nothing to suggest the court believed it was significant that an unremembered witness had viewed Marsh as a "criminal type." Considering the context in which the court's statement was made, we cannot fault Marsh's counsel for failing to register any objection to it.

## DISPOSITION

The postjudgment order is affirmed.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.