Filed 8/30/24  P. v. Adams CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>FREDERICK BERNARD ADAMS,<br><br>        Defendant and Appellant. | A168688<br><br>(Humboldt County<br>Super. Ct. No. CR2101465) |

A jury convicted defendant Frederick Bernard Adams of six felonies after he sexually abused his stepdaughter, C.C., and his daughter, Jane Doe. He was sentenced to 50 years to life plus two years and eight months in prison.

On appeal, Adams claims that (1) his conviction of lewd acts against Doe in count two must be reversed because the crime was not proven to fall outside the period for which he was convicted of continuous sexual abuse of her in count one; (2) his conviction for lewd acts against Doe in count five must be reversed because she was 16, not 15, years old when the crime was committed; and (3) his sentences on three counts under the One Strike law, Penal Code section 667.61, must be reversed because a multiple-victim enhancement was not adequately pled or proven.[1]  We accept the Attorney

---

[1] All further statutory references are to the Penal Code.

General's concession that count five, on which Adams was sentenced to a term of eight months, must be reversed.  Otherwise, we affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.    Background*

C.C. was born in October 2001 to H.R. (mother) and another man.  Two years later, in early 2004, mother began dating Adams.  They married later that year and had two children together, Doe in March 2005 and a son in September 2009 (brother).[2]

In the spring of 2013, while the family was living in Fortuna, mother left Adams and moved to Lake County with C.C.  About six months later, mother and C.C. returned to Humboldt County.  They lived separately from Adams, Doe, and brother, who had recently moved to Scotia.  Doe and brother stayed with mother for half the week and Adams for the other half, and C.C. stayed with Adams about once a week.

Adams, Doe, and brother moved twice more in the next few years:  to Rio Dell in September 2014 and to another house in Scotia in August 2015.  Mother and Adams eventually reconciled, and in February 2016, she and C.C. moved into the Scotia house with him and the other children.  The family lived in Scotia until September 2019 and then moved back to Rio Dell.

Adams was the "primary disciplinarian" in the family.  Mother testified that he was "strict" with the children, and he often spanked them.  Once, she saw him spank C.C. and Doe with a belt.  C.C. testified that from the time she was 8 or 9 years old to the time she was 10 or 11, Adams would physically discipline her by making her pull down her pants and underwear and

---

[2] Mother had another daughter in the fall of 2014, whom we do not discuss further because she played little role in the underlying events.

2

spanking her with a belt.  Even after he stopped spanking her, he routinely threatened to do so whenever he thought she had misbehaved.  C.C. also saw Adams spank Doe and beat brother.  Doe testified that Adams routinely hit her, C.C., and brother "upside the head" if they did something he did not like.

Mother testified that while C.C. and Doe were growing up, Adams insisted that they kiss him on the lips.  According to C.C., "[i]t had to be on the lips and it had to be like if you were kissing a partner[.] . . . [I]f you pecked him on the lips, he would get upset and tell you to kiss him right."  Doe testified that if the girls did not kiss Adams for long enough, he would "scold" them.

B.    *The Sexual Abuse of C.C.*

Count six, the only charge involving C.C., stemmed from offenses that occurred when she was 12 and 13 years old.  C.C., who was 21 years old at the time of trial, testified that Adams started touching her inappropriately when she began puberty.  Adams "would hug [her] from behind and try to squish [her] boobs," telling her that "he wanted to stop them from growing."  He squeezed her chest "[r]eally hard" over her clothes.  He would also "smack [her] on the ass" when she walked by him.  According to C.C., both types of behavior happened "[a]lmost every day."  Later, when she was 14 or 15 years old, Adams would routinely "stick his hand underneath [her] shirt" and "unclip [her] bra."

C.C. had weekly overnights with Adams before he and mother reconciled, when she was 12 to 13 years old.  While Doe and brother slept in their own bedrooms, Adams required C.C. to sleep in his bed.  Although C.C. told him she did not want to, he told her she would get in trouble if she did not.  C.C. "would be l[]ying there with [her] back turned towards him and then he would forcefully either scoot [her] closer to him or roll [her] over and

3

then stick his hand on top of [her] private." A few times, C.C. forced herself to throw up so that Adams thought she was sick and let her sleep on the couch.

During the same time period, Adams got very angry with C.C. after she wore a hole in a sweatshirt of his that she borrowed. While C.C. was still upset from his yelling at her and was "crying [her] eyes out," she told mother, who had come to take her to school, "everything" about the sexual abuse. Mother "called [C.C.] a liar" and got angry with her, asking her "if [she] wanted [Adams] to go to jail." C.C. was "frustrated" and sad that mother would not believe her, and she never raised the issue with mother again.

Ultimately, Adams stopped sexually abusing C.C. when she was 15 years old, after she had an "inappropriate relationship" with an older man. She left home in the fall of 2020, soon after graduating from high school, because Adams and mother kicked her out.

### C.    The Sexual and Physical Abuse of Doe

Doe, who was 18 years old at the time of trial, testified about abuse that began when she was 11. It continued until Adams was arrested in May 2021, when she was 16.

#### 1.    Count one

Doe testified that when she was 11 years old, Adams began "coming behind [her] and giving [her] bear hugs and putting his hands up [her] shirt and squeezing [her] breasts and pinching [her] nipples, saying he was stopping them from growing." Adams squeezed her very hard, which hurt, and she felt "[e]xtremely uncomfortable and helpless." Doe estimated that this happened "[a] hundred to two hundred" times while she was 11. Although she told Adams several times that she was uncomfortable with this, he said that "he wasn't a pervert and that it was just a game."

4

Around the same time, Adams also began routinely awakening Doe in the morning "[b]y putting a hand up [her] shirt and either pinching [her] nipples or grabbing [her] breast." Doe began sleeping with a bra on to discourage this behavior, but Adams would unsnap her bra before feeling her. He told her that sleeping in a bra was "not good for [her] and would just be visibly upset about [her] wearing a bra." Doe testified that this behavior persisted for years.

Adams initially squeezed Doe's breasts in front of other members of the family. Mother and C.C. recalled seeing Adams squeeze Doe's chest "[a]lmost every day." Doe testified that at some point after Adams started touching her, while she was still 11 years old, she told mother what was happening and there was a family meeting about it. During the meeting, Adams "explained to [Doe] with tears in his eyes that his intention was not to make [her] uncomfortable and that it was just a game." The groping "stopped for about a month or two" after this meeting, but Adams then resumed the behavior, which "got progressively worse" and "became more secretive."

### 2. Count two

Wildwood Days was a three-day festival held in Rio Dell each year on the first weekend in August. Doe testified that one year, Adams came home from Wildwood Days "intoxicated."[3] As he was sitting in the living room, he "had [Doe] sit on his lap and was asking [her], please, just this one time . . . let me do it[,] and [she] repeatedly told him no and no until eventually [she] felt extremely pressured and [she] gave in." Adams then touched her breasts.

---

[3] As discussed further in section II.A. below, there was conflicting evidence about which year this offense occurred. Most of the evidence suggested that it happened in either 2016, when Doe was 11 years old, or 2017, when she was 12.

5

### 3. Counts three and four

Doe also testified about sexual and physical abuse that occurred at Adams's automobile repair shop in Fortuna. Adams opened the shop in June 2018, and Doe began working there the following summer, when she was 14 years old and had just finished eighth grade. She worked full-time without pay that whole summer, doing bookkeeping, cleaning, and other tasks while Adams worked on vehicles. Because Doe's "parents believed that [she] was not trustworthy enough to be in school due to [her] going on social media and talking to boys," she was homeschooled during ninth grade through a local high school's independent study program. The program was mostly self-directed, and Doe continued to work full-time in the shop that academic year and the following summer.

Doe testified that during this period, if she asked for lunch, a ride, or some other favor, Adams would ask her " 'what [she was] going to do for it' or 'what [she was] going to let him do to [her] for it' in a sexual way." Adams would then abuse her at the shop, either in the back room or the main office area if the shop was closed. Doe testified that in addition to continuing the behavior of squeezing her breasts, Adams sometimes made her display herself to him: "There [were] times I would have to drop my pants and underwear down to my ankles and bend over in front of him for a minute to two minutes at a time—he would set a timer on his phone most of the time or he would count really slowly—or [I would be] standing there with my shirt and bra up or even both at the same time . . . , the pants and the shirt." Doe agreed that this "negotiation process" happened "hundreds of times," starting when she was 14 years old.

Doe described a particular example of this type of abuse, which formed the basis for count four, during a forensic interview.[4] In late 2020, when Doe had returned to some in-person schooling, she met and began dating a boy (boyfriend) who attended her high school. Doe told the interviewer that once, when she and boyfriend "were first hanging out," she wanted to spend time with him. In exchange for driving her, Adams required her "to bend over for [25] seconds" with her pants and underwear pulled down to her ankles while he "just looked."

Doe also testified about an incident of physical abuse that occurred when she was at the shop with Adams, which formed the basis for count three. He asked her "to go to the back of the shop," and Doe said she wanted to go home. Adams then "backhanded [her] upside the head." Upon noticing that Doe had made a mistake doing inventory, he became even more angry. Doe repeated that she wanted to go home, and Adams hit her again. Doe said she "wanted [her] mom," at which point Adams "put [Doe] in a chokehold and [dragged her] to the oil room and started hitting [her] extremely hard." Doe testified that she "screamed and cried" as Adams hit her. The beating resulted in handprints on her right hip and leg that lasted a few days.

4. Count five

Doe and boyfriend often played video games together remotely, during which they talked to each other through headsets. On one occasion in May 2021, Doe and boyfriend were playing video games together when she briefly left her bedroom to ask her parents for a ride to school the next day. Before she left the room, she hung the headset on her bed frame. Although

_____

[4] The forensic interview was conducted in May 2021, on the same day that Adams was arrested. A video recording of the interview was played for the jury.

7

she sometimes muted the headset's microphone if she "thought there was going to be an argument or any kind of loud noises," this time it was still on.

Doe testified that she asked for a ride, and mother told her to talk to Adams. When Doe looked over at him, "he gave [her] the well-what-are-you-going-to-do-for it look." She said, "Never mind," and "stormed off to [her] room." Adams followed her there, at which point he told her, "I'll take you to school, but, come on, just do it. Like, just lift up your shirt." Doe refused, but Adams repeatedly asked her to lift her shirt. Since Adams "would never leave until he got what he wanted," Doe finally gave in and "just got it over with so he would leave."

Boyfriend testified that he overheard parts of Doe's conversation with Adams. According to boyfriend, after Doe asked for a ride, he heard Adams say something about "a deal." Boyfriend could hear "a lot of key stuff mentions of, like, [o]ne more time, kind of begging. There [were] no specifics about what the deal was but, obviously, it had some interest to [Adams], something that he wanted, something that made [Doe] uncomfortable." Boyfriend heard Doe repeatedly say "that she wanted to go to sleep," but she kept "being pestered" by Adams.

When Doe put her headset back on and resumed talking to boyfriend, she was "hysterical." Boyfriend asked her what had just happened, but she was too upset to talk. Eventually, however, Doe revealed to boyfriend "everything that had been going on for the last five years at that point," including the "deals" Adams required. Boyfriend told her that they "were going to fix this" and if she did not tell mother, he would.

After talking to boyfriend, Doe disclosed Adams's sexual abuse to mother. Mother took Doe to the Rio Dell police station to report Adams, and he was arrested.

8

## C. Other Prosecution Evidence

Other witnesses corroborated various aspects of C.C.'s and Doe's stories.[5] Mother testified that she routinely saw Adams "come up behind [C.C.] and . . . Doe and give them hugs . . . [and say] he was squishing their breasts back in so they wouldn't grow." Mother also saw Adams unsnap the girls' bras "[q]uite often" and "laugh because he thought it was funny." Mother confirmed there was a family meeting at which Adams "cried and said that he didn't realize that this is how it was making the girls feel and that he would stop," but his inappropriate behavior continued.

A married couple who lived with the family for several years also testified about Adams's behavior toward the children. The husband testified that he saw Adams "wrap his arms around [C.C.]" from behind and tell her, while touching her breasts, "Suck your chichis in." The husband also saw Adams do the same thing to Doe, at least 10 times. Similarly, the wife saw Adams give the girls bear hugs and touch their breasts, which he did "[f]requently" to Doe. Both the husband and wife also saw Adams slap both girls on the butt a few times.

Mother also provided testimony corroborating Doe's reports of being beaten at the shop and having to negotiate with Adams to get what she wanted. Mother testified that Doe told her at the time about being beaten at the shop, and mother saw "[b]ruising on [Doe's] arms and . . . a bruise on her leg." Mother also testified that Adams sometimes made deals with her in exchange for sex. Frequently, if mother was not interested in having sex but

---

[5] These witnesses also described uncharged acts against Doe to which she did not testify. One such incident was when Adams got mad at Doe for using her cell phone, picked her up, and "body slammed her into" a couch, breaking it.

9

he wanted to, "he would tell [her] in exchange for having sex, [she] could have a special coffee, a special lunch, a special dinner, maybe a trip to Walmart."

Dr. Anthony Urquiza, Ph.D., testified as an expert on child sexual abuse accommodation syndrome. Among other things, he testified that children who are sexually abused often do not report the abuse because they feel threatened or intimidated, particularly if the perpetrator also physically abuses them. He also testified that children often delay reporting abuse for a long time, making it more difficult to describe particular incidents or remember exactly when they happened.

### D. Adams's Testimony and Other Defense Evidence

Adams testified in his own defense. He admitted that he slept in the same bed once with C.C. when she came to visit him during the marital separation because she asked him to, but he did not touch her. He also gave Doe "bear[]hugs" during which he would squeeze her "more than a normal hug," and he admitted that he said a few times that if he "bearhugged her hard enough, maybe it'd keep her [breasts] from growing." He denied touching her breasts, however, and he did not remember any family meeting about his behavior. He also denied most of the other conduct C.C. and Doe described, including giving C.C. bear hugs or smacking her butt, beating Doe at the shop, or making Doe expose herself in exchange for favors.

Several of Adams's family members and friends provided character evidence. Generally, they testified that they did not notice anything odd about Adams's relationships with C.C. and Doe. Some witnesses also testified that C.C. and Doe had reputations for not being honest.

### E. Procedural History

The operative information charged Adams with six felonies, five against Doe and one against C.C. As to C.C., Adams was charged with

10

continuous sexual abuse between January 1, 2014, and October 8, 2015 (count six). As to Doe, he was charged with continuous sexual abuse between March 16, 2016, and March 16, 2017 (count one); lewd acts upon a child under 14 years old between August 3 and August 5, 2018, based on the Wildwood Days incident (count two); corporal injury to a child between March 16, 2019, and March 15, 2020, based on the beating at the shop (count three); lewd acts upon a 14- or 15-year-old child between January 1 and January 31, 2021, based on the time Adams made Doe pull down her pants and bend over for 25 seconds (count four); and lewd acts upon a 14- or 15-year-old child around April 29, 2021, based on the incident boyfriend overheard (count 5).[6] The information also alleged that Adams committed the offenses against more than one victim under 14 years of age.[7]

The jury found Adams guilty of all six counts as charged. In August 2023, the trial court sentenced him to a total term of 50 years to life plus two years and eight months in prison, composed of a term of 25 years to life for count one, a consecutive term of 25 years to life for count six, a concurrent term of 25 years to life for count two, and consecutive terms of 16 months for count three and eight months each for counts four and five.

II.
DISCUSSION

A.    *Adams's Claim that Count Two Must Be Reversed Lacks Merit.*

Adams argues that his conviction of count two, lewd acts on Doe when she was under 14 years old based on the Wildwood Days incident, must be

---

[6] The charges were brought under sections 288.5, subdivision (a) (counts one and six), 288, subdivisions (a) (count two) and (c)(1) (counts four and five), and 273d, subdivision (a) (count three).

[7] The multiple-victim circumstance was alleged under section 667.61, subdivisions (e) and (j)(2).

11

reversed because the prosecution failed to prove that the incident occurred "during the time period alleged in the complaint" or "outside of the time period alleged" for count one, the continuous sexual abuse of Doe. We are not persuaded.

### 1. Additional facts

Count one was alleged to have occurred "[o]n or about March 16, 2016, through March 16, 2017," between the day Doe turned 11 years old and the day she turned 12. Count two was alleged to have occurred "[o]n or about August 3, 2018, through August 5, 2018," when Doe was 13. The jury was instructed under CALCRIM No. 207 that the prosecution was "not required to prove that the crimes took place exactly on" the dates alleged "but only that [the crimes] happened reasonably close to those dates."[8]

Doe reported during her forensic interview that Adams began molesting her when she was 11 years old, and "that went on for about a year" before she told mother and the behavior stopped. She indicated that the Wildwood Days incident happened after this pause. At trial, Doe initially testified that the Wildwood Days incident happened when she was 11 or 12 years old, which would have made it August 2016 or August 2017. She also indicated that it occurred after the family meeting at which Adams promised to stop touching her.

On cross-examination, Doe first said that the incident happened in August 2014 or August 2015, but then stated, "No. It would have been 2016. I don't know. It was one of the teens." She then affirmed that she was 11 or 12 years old at the time, agreeing that "it would have been at least 2016."

_____

[8] The jurors were also instructed under CALCRIM No. 3502, a unanimity instruction, that they must "all agree that the People have proved specifically that the defendant committed that offense during Wildwood Days in Rio Dell between August 3-5[,] 2018."

12

Finally, on redirect, Doe agreed with the prosecutor that she was "sure" that she "would have been under 14" at the time of the incident, meaning it was August 2018 or earlier.

Doe also testified that she thought the Wildwood Days incident happened when Adams "was in logging. He would have been living in Scotia." As noted above, the family lived in Scotia from August 2015 to September 2019. Doe described Adams's work schedule at this time as often requiring him to be gone from the home. She testified that the work was seasonal for the summer, and during this time he would "[co]me home every other day, every other night[,] and then would go back into the hills."

In fact, Adams was working on a marijuana grow, not logging. He testified that after working at a hydroponics store from 2012 to April 2016, he spent the summer of 2016 working on the grow. During the season, which lasted from May to October, he spent six days a week living "in the hills" and one day a week at home in Scotia. Adams testified that he also worked at the grow on the same schedule the summer of 2017. Adams's father agreed that Adams worked at the grow for two summers. Mother, however, testified that Adams worked there in 2017 only.

Adams testified that he did not attend Wildwood Days in 2016, 2017, or 2018. Although he attended in previous years because he worked at the volunteer fire department, which was very involved in the festival, he had quit the department by August 2016 because he was too busy working at the marijuana grow. He claimed that as a result of that work, he did not attend Wildwood Days in 2016 or 2017. By August 2018, he had opened the shop, and he was too busy working to attend that summer either.

2.    Analysis

Adams makes what is essentially a claim of insufficient evidence, although he does not clearly describe it as such. The claim has two distinct components, that the evidence failed to prove either that the Wildwood Days incident occurred (1) outside the time period alleged for count one or (2) within the time period alleged for count two.

In determining whether sufficient evidence supports a conviction, "we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 712.) " 'We presume in support of the judgment the existence of every fact the trier of fact could reasonably infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Id.* at pp. 712–713) To the extent Adams's claim raises issues of statutory interpretation or other questions of law, our review is de novo. (*Rodriguez v. Superior Court* (2023) 15 Cal.5th 472, 496.)

Under section 288.5, a person who lives with a child and "who over a period of time, not less than three months in duration, engages in . . . three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child." (§ 288.5, subd. (a).) To convict a defendant of this crime, the jury "need unanimously agree only that the requisite number of acts occurred[,] not on which acts constitute the requisite number." (§ 288.5, subd. (b).) For any count of

14

continuous sexual abuse charged, however, "[n]o other act of . . . lewd and lascivious acts, as defined in Section 288, involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative." (§ 288.5, subd. (c).)

Thus, section 288.5 "punishes repetitive activity as a course of conduct, defined as at least three acts over at least three months." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 75, italics omitted.) The statute was enacted to address "the due process and unanimity problems" that occurred when victims of child molestation "gave generic testimony about the instances of abuse" but "could not . . . link any instance with a particular date or significant event." (*Id.* at pp. 74–75; *People v. Johnson* (2002) 28 Cal.4th 240, 242.) Though section 288.5 permits a conviction based on such generic testimony, it also protects a defendant by limiting the prosecution to one count of continuous sexual abuse per victim and "prevent[ing] multiple convictions for both a course of conduct and the acts that comprised it." (*Cortes*, at pp. 76, 78; *Johnson*, at pp. 243–244.)

We conclude there was ample evidence that the Wildwood Days incident happened in August 2017, outside the period of continuous sexual abuse from March 16, 2016, to March 16, 2017. Doe made statements during both her forensic interview and the trial permitting the conclusion that the incident occurred in 2017, when she was 12 years old. In addition, Doe said during the forensic interview that the incident happened when Adams was working in the hills, and he and mother both testified that he did so in the summer of 2017. Indeed, mother testified that 2017 was the only year he worked at the grow. In short, the jury had substantial evidence from which it

15

could have reasonably concluded that the Wildwood Days incident happened in August 2017.

Adams does not seriously argue otherwise, stating only that "[t]here was some ambiguity in that Doe allowed that the count two offense could have occurred when she was 12, and only one day of her 12th year was included in the time period alleged as to count one." But it was uncontested that Wildwood Days happened every August, meaning that if the incident occurred when Doe was 12 years old, it was in August 2017, not on her birthday that year. Adams does not otherwise explain why there was insufficient evidence that the Wildwood Days incident occurred after March 16, 2017.

Adams's main claim is that there was insufficient evidence that the Wildwood Days incident occurred in August 2018, as alleged in the information. Even if we assume there was insufficient evidence that the incident occurred that month, Adams fails to cite any authority for the proposition that the prosecution was required to prove that the incident happened then. Thus, the argument is forfeited. (See *People v. Holford* (2012) 203 Cal.App.4th 155, 186 [points on appeal forfeited if appellant "offers no reasoned argument or citation to authority"].)

In any event, Adams's contention that proof of an August 2018 date was required lacks merit. "The precise time at which [an] offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense." (§ 955.) Although the fact that the Wildwood Days incident happened after the continuous sexual abuse was a material ingredient of count two, we do not see why whether the incident occurred in August 2018 instead of the

16

previous August would matter. The only time-based element of count two was that it occurred when Doe was under 14 years old (§ 288, subd. (a)), which she undisputedly was in both 2017 and 2018. Nor do we perceive how the variance between August 2017 and August 2018 could have prejudiced Adams. (See *People v. Meyer* (1963) 216 Cal.App.2d 618, 638.) He denied attending Wildwood Days in 2016, 2017, or 2018, and there was no suggestion that his defense might have changed had the prosecution charged count two as occurring in August 2017. In short, he fails to show that reversal of count two is required.

B. *Count Five Must Be Reversed for Insufficient Evidence that Doe Was the Required Age.*

Adams also claims that his conviction on count five, the count of lewd acts against a 14- or 15-year-old based on the incident that boyfriend overheard, must be reversed because Doe was 16 years old at the time. We accept the Attorney General's concession that reversal is required.

Adams was convicted of count five under section 288, subdivision (c)(1), which applies to "any lewd or lascivious act" committed against "a child of 14 or 15 years." (§ 288, subds. (a), (c)(1).) As the Attorney General notes, there was no dispute that the crime charged in count five occurred in late April or early May 2021, which was at least a month after Doe turned 16 years old. As a result, there is insufficient evidence to support the conviction.

C. *The One Strike Sentences Were Properly Imposed.*

Finally, Adams challenges his One Strike sentences of 25 years to life on counts one (continuous sexual abuse against Doe), two (lewd acts on Doe when she was under 14 years old based on the Wildwood Days incident), and six (continuous sexual abuse against C.C.). He claims that these terms cannot stand because they "violated [his] due process rights to notice and to jury findings based on proof beyond a reasonable doubt." We reject the claim.

17

1. Additional facts

The amended information filed shortly before trial contained a global allegation under the One Strike law. That allegation read: "It is further alleged, as to Count 1 through Count 6, within the meaning of Penal Code sections 667.61(j)(2) and (e), that the victims in the above offenses were children under 14 years of age, and that the following circumstance applies: the defendant has committed offenses specified in Penal Code section 667.61(c) against more than one victim in the present case."

The trial court and the parties had an informal, off-the-record discussion of jury instructions, after which the court memorialized the discussion on the record. The court granted the People's request not to give CALCRIM No. 3181, the form instruction on the multiple-victim circumstance under section 667.61, subdivision (e)(4). That instruction provides that if the jury "find[s] the defendant guilty of two or more sex offenses, . . . [it] must then decide whether the People have proved the additional allegation that those crimes were committed against more than one victim in this case." (CALCRIM No. 3181.) The prosecutor contended "that when a jury makes guilty findings as to relevant counts for separate victims during the requisite age period, . . . [i]t's not necessary to have a separate special finding verdict form [about the multiple-victim circumstance] because the jury's finding would already be contained in the guilty verdict." Consistent with this discussion, the jury was not asked on the verdict forms to make any findings under section 667.61.

At the same hearing, the trial court also clarified that the multiple-victim circumstance applied only to counts one, two, and six, stating, "The Court's calendar as to the special allegations, 667.61(j)(2) alleges One through Six. The Court's calendar says only as to Six. I'll just correct that

18

that the 667.61(j)(2) should be as to Counts One, Two[,] and Six." The hearing's minute order states, "As to Special Allegations pursuant to PC667.61(j)(2), the Court corrects the Court Calendar and the First Amended Information filed June 9, 2023[,] to reflect said Special Allegation as to Count 1, Count 2[,] and Count 6."

At the sentencing hearing, the trial court made a further record about its decision not to give CALCRIM No. 3181. After "not[ing] that the People advocated that [the court] not give [the instruction] and that was acquiesced [to] by the defense," the court explained its view that the procedure used complied with *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*). First, the multiple-victim circumstance was clearly pled, so Adams was on notice of "the potential for a finding of multiple victims." Second, the jurors effectively found that there were multiple victims by returning the verdicts, and it would have been "redundan[t]" to require them to decide separately that "there [were] two victims in this case." The court asked whether Adams's trial counsel wished to respond to its "comments in respect to the *Mancebo* issue," and counsel said he had "nothing to say" about it.

### 2. Analysis

The One Strike law "provides an alternative, more severe set of penalties for certain sex offenses committed under certain enumerated circumstances." (*People v. Anderson* (2020) 9 Cal.5th 946, 954.) Both crimes at issue, continuous sexual abuse under section 288.5 and lewd acts upon a child under 14 years old under section 288, subdivision (a), are qualifying sexual offenses under the One Strike law. (§ 667.61, subd. (c)(8) & (9).) One circumstance supporting an enhanced penalty is that "[t]he defendant has been convicted in the present case . . . of committing an offense specified . . . against more than one victim." (§ 667.61, subd. (e)(4).) If that circumstance

19

exists, then a defendant convicted of a qualifying offense "upon a victim who is a child under 14 years of age . . . shall be punished by imprisonment in the state prison for 25 years to life." (§ 667.61, subd. (j)(2).) To subject a defendant to an enhanced penalty, a circumstance must be "alleged in the accusatory pleading pursuant to this section, and . . . either admitted by the defendant in open court or found to be true by the trier of fact." (§ 667.61, subd. (o).) Adams's challenge to his sentence raises questions of law that we review de novo. (See *People v. Camp* (2015) 233 Cal.App.4th 461, 467.)

Adams first claims that because the information's One Strike allegation was made as to all counts, "including those to which it could not be applied," the allegation "was ambiguous and failed to give due process notice of exactly what sentence the prosecution sought and as to which counts." "A defendant has a due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime. [Citations.] In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted." (*In re Vaquera* (2024) 15 Cal.5th 706, 717.) A One Strike allegation, like a sentencing enhancement allegation, " 'exposes a defendant to greater punishment than would be authorized by a verdict on the offense alone.' " (*Id.* at p. 718.) Thus, in *Mancebo,* the Supreme Court held that "the prosecution must provide the defendant 'fair notice of the qualifying statutory circumstance or circumstances that are being pled, proved, and invoked in support of One Strike sentencing.' " (*Vaquera*, at p. 718, quoting *Mancebo, supra*, 27 Cal.4th at p. 754.)

Adams is correct that the One Strike allegation at issue was inapplicable to counts three through five, the first of which was not a sex offense and the latter two of which were not against victims under age 14.

(See § 667.61, subds. (c), (j)(2).)  But he fails to recognize that the trial court amended the information during trial to specify that the challenged allegation applied only to counts one, two, and six.  Thus, even if we were willing to accept that Adams was somehow deprived of notice that the prosecution sought One Strike terms on those three counts because it also sought such terms on the remaining counts, the issue was addressed when the information was amended.  In short, we agree with the court that the One Strike allegation was adequately pled.

Adams also claims that the jury failed to make a finding on the One Strike allegation as statutorily required.  Citing *Mancebo*, he argues that "[t]he specific pleading and proof requirements of section 667.61 cannot be satisfied by de facto findings under some other provision of law.  [Citation.]  Therefore, any findings regarding the victim's age under any other provision of law without unambiguous notice of the prosecution's intention to seek sentencing on a specific count under . . . section 667.61, subdivision (j)(2), would not give due process notice of the sentencing provision sought to be applied."  He also mentions in passing that the court had "a sua sponte duty to instruct" on the allegation.  (Italics omitted.)

Adams's argument appears to be premised on his claim that the One Strike allegation was inadequately pled, which we have rejected.  Moreover, as the trial court explicitly found, his trial counsel agreed the jury need not be instructed on the multiple-victim circumstance.  Thus, Adams forfeited his complaint about the jury's failure to make a specific finding on that circumstance.

The argument also fails if we consider it on its merits.  *Mancebo* did not involve the requirement that a One Strike enhancement be proven.  The Supreme Court did, however, distinguish a decision addressing that

21

requirement, *People v. Jones* (1997) 58 Cal.App.4th 693. (*Mancebo*, *supra*, 27 Cal.4th at p. 748.) In *Jones*, the defendant claimed the trial court erred by failing to instruct the jury on the multiple-victim circumstances alleged, resulting in the jury's making no true finding on those circumstances. (*Jones*, at pp. 709–710.) The Fourth District Court of Appeal held that by finding that the offenses at issue were committed against different victims, the jury clearly "intended to find each multiple[-]victim circumstance true." (*Id.* at p. 711.) Even if the jury had not done so, "or even if its findings did not adequately track the language of the multiple[-]victim circumstance," the court concluded that "the error was harmless beyond a reasonable doubt, because the jury necessarily resolved the factual question posed by the omitted instruction[] adversely to [the] defendant under other, properly given instructions." (*Id.* at pp. 709, 711.)

*Jones*, which Adams does not mention, disposes of his argument. Here, the jury necessarily found that Adams committed a qualifying offense "against more than one victim" who was "a child under 14 years of age." (§ 667.61, subds. (e)(4), (j)(2).) The fact that the victim is under 14 is an element of continuous sexual abuse (counts one and six) and lewd acts against a child under 14 (count two), and C.C. and Doe were specified as the victims on the verdict forms for their respective counts. Thus, by finding him guilty of counts one, two, and six, the jury necessarily concluded that he committed qualifying offenses against more than one victim under age 14. Accordingly, any error in failing to require a separate finding on the One Strike allegation was harmless. (See *People v. Jones*, *supra*, 58 Cal.App.4th at p. 709.)

## III.
### DISPOSITION

Adams's conviction on count five is reversed, and his sentence is vacated. The matter is remanded for a full resentencing. The judgment is otherwise affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Langhorne Wilson, J.



_____

Siggins, J.*


*Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Adams*  A168688